## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOARD OF TRUSTEES, ROOFERS UNION     :
    LOCAL 30 COMBINED HEALTH AND     :
    WELFARE FUND,     :     CIVIL ACTION NO.
BOARD OF TRUSTEES, ROOFERS UNION     :
    LOCAL 30 COMBINED PENSION FUND,     :
BOARD OF TRUSTEES, ROOFERS UNION     :
    LOCAL 30 COMBINED ANNUITY FUND,     :
BOARD OF TRUSTEES, ROOFERS LOCAL 30     :
    JOINT APPRENTICESHIP FUND OF     :
    PHILADELPHIA AND VICINITY     :
ROOFERS LOCAL 30 POLITICAL ACTION     :
    AND EDUCATION FUND     :
LOCAL UNION NO. 30 OF THE UNITED     :
    UNION OF ROOFERS, WATERPROOFERS     :
    AND ALLIED WORKERS, and     :
SHAWN McCULLOUGH, a Fiduciary     :
6447 Torresdale Avenue     :
Philadelphia, PA 19135     :
    :
    and     :
    :
ROOFING CONTRACTORS ASSOCIATION     :
    INDUSTRY FUND     :
414 Rector Street     :
Philadelphia, PA 19128     :
    :
        Plaintiffs,     :
    :
    v.     :
    :
UNION ROOFING CONTRACTORS, INC.     :
    d/b/a UNION ROOFING     :
    d/b/a UNION ROOFING & SHEET METAL     :
    CONTRACTORS, INC.     :
12260 Townsend Rd.     :
Philadelphia, PA 19154     :
    :
    and     :
    :
C.R. THOMPSON ROOFING     :
    d/b/a C.R. Thompson Roofing Company     :
12260 Townsend Rd.     :
Philadelphia, PA 19154     :

1

and                                             :
                                                :
                                                :
PHILLY ROOFING                                  :
12260 Townsend Rd.                              :
Philadelphia, PA 19154                          :
                                                :
        and                                     :
                                                :
FRANK LUBSIKY, an individual                    :
12260 Townsend Rd.                              :
Philadelphia, PA 19154                          :
                                                :
                        Defendants.             :

## COMPLAINT

Plaintiffs, by undersigned counsel, complain about Defendants as follows:

## JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action under 29 U.S.C.

§§ 1132, 1145; 29 U.S.C. §185(a); and/or 28 U.S.C. § 1331.  The claims asserted are all made

under federal statutes or federal common law, but the supplemental jurisdiction of the Court

under 28 U.S.C. § 1367(a) also extends to any claims that are found to lie under state law.

2.      A copy of this Complaint is being served on the Secretary of Labor and the

Secretary of Treasury of the United States by certified mail in accordance with 29 U.S.C. §

1132(h).

## VENUE

3.      Venue lies in the Eastern District of Pennsylvania under 29 U.S.C. § 1132(e)(2),

29 U.S.C. § 185(a) and/or 28 U.S.C. § 1391(b).

## PARTIES

4.      Plaintiff Board of Trustees, Roofers Union Local 30 Combined Health and

Welfare Fund is the collective name of the trustees of the Roofers Union Local 30 Combined

Health and Welfare Fund, a trust established under 29 U.S.C. § 186(c)(5). The Trustees are the "named fiduciary," "plan administrator," and "plan sponsor," and each is an individual "fiduciary," within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21), of the Roofers Union Local 30 Combined Health and Welfare Plan ("Welfare Plan") and Roofers Union Local 30 Vacation Plan ("Vacation Plan").[1] The trust, its trustees, and the Welfare and Vacation plans are jointly and severally referenced as "Welfare Fund" in this Complaint.

5.      The Welfare Plan is a "multiemployer plan," "employee welfare benefit plan," and "employee benefit plan" within the meaning of 29 U.S.C. § 1002(37), (1), and (3). The Welfare Plan is also known as and referenced as the "Welfare Fund" and "Roofers Local 30 Health and Welfare Fund" in the Labor Contract related to this Complaint.

6.      The Vacation Plan is a "multiemployer plan," "employee welfare benefit plan," and "employee benefit plan" within the meaning of 29 U.S.C. § 1002(37), (1), and (3). The Vacation Plan is known as and referenced as the "Vacation Fund" in the Labor Contract related to this Complaint.

7.      Plaintiff Board of Trustees, Roofers Union Local 30 Combined Pension Fund is the collective name of the trustees of the Roofers Union Local 30 Combined Pension Fund, a trust established under 29 U.S.C. § 186(c)(5). The Trustees are the "named fiduciary," "plan administrator," and "plan sponsor" and each is an individual "fiduciary," within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21), of the Roofers Union Local 30 Combined Pension Plan ("Pension Plan"). The trust, its trustees, and plan are jointly and severally referenced as "Pension Fund" in this Complaint.

---

[1] Effective January 1, 2015, the Composition Roofers Local 30 Combined Vacation Fund ("Vacation Fund") merged into the Welfare Fund.

8.     The Pension Plan is a "multiemployer plan," "employee benefit plan," and "employee benefit pension plan" within the meaning of 29 U.S.C. § 1002(37), (2), and (3). The Pension Plan is also known as and referenced as the "Roofers Local 30 Pension Fund" and "Pension Fund" in the Labor Contract relating to this Complaint.

9.     Plaintiff Board of Trustees, Roofers Union Local 30 Combined Annuity Fund is the collective name of the trustees of the Roofers Union Local 30 Combined Annuity Fund, a trust established under 29 U.S.C. § 186(c)(5). The Trustees are the "named fiduciary," "plan administrator," and "plan sponsor" and each is an individual "fiduciary," within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21), of the Roofers Union Local 30 Combined Annuity Plan ("Annuity Plan"). The trust, its trustees, and plan are jointly and severally referenced as "Annuity Fund" in this Complaint.

10.     The Annuity Plan is a "multiemployer plan," "employee benefit plan," and "employee benefit pension plan" within the meaning of 29 U.S.C. § 1002(37), (2), and (3). The Annuity Plan is also known as and referenced as the "Roofers Local 30 Annuity Fund" and "Annuity Fund" in the Labor Contract relating to this Complaint.

11.     Plaintiff Board of Trustees, Roofers Local 30 Joint Apprenticeship Fund of Philadelphia and Vicinity is the collective name of the trustees of the Roofers Local 30 Joint Apprenticeship Fund of Philadelphia and Vicinity ("Apprenticeship Fund"). The Apprenticeship Fund is a trust established under 29 U.S.C. § 186(c)(5) and "multiemployer plan," "employee welfare benefit plan," and "employee benefit plan" within the meaning of 29 U.S.C. § 1002(37), (1), and (3). The trust, its trustees and plan are jointly and severally referenced as "Apprenticeship Fund" in this Complaint and "Roofing Apprenticeship Fund," "Joint Roofing Apprenticeship Fund," and "Joint Apprenticeship Program Fund" in the Labor Contract relating

to this Complaint.

12.     Plaintiff, Roofing Contractors Association Industry Fund ("Industry Fund") is the common name of an account or fund established and maintained by the Roofing Contractors Association for the purpose of fostering and advancing the interest of the commercial roofing industry in the Philadelphia area.

13.     Plaintiff, Roofers Local 30 Political Action and Education Fund ("PAC") is an unincorporated association established pursuant to 2 U.S.C. § 431 et seq. for the purpose of advancing the political interests of the members of the Union by lawfully influencing the selection, nomination, election, and/or appointment of individuals for political office.  The PAC is also known as and referenced as the "Roofers Local 30 Political Education Fund" in the Labor Contract relating to this Complaint.

14.     Plaintiff, Local Union No. 30 of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO ("Union"), is an unincorporated association commonly referred to as a labor union, and is an employee organization which represents, for purposes of collective bargaining, employees of Defendants who are and/or were employed in an industry affecting interstate commerce within the meaning of 29 U.S.C. §§ 152(5), (6) and (7), 185(a) and 1002(4), (11) and (12).

15.     The Welfare Fund, Pension Fund, Annuity Fund, Apprenticeship Fund (jointly or severally, "ERISA Funds"), Industry Fund, and the Union (together with the ERISA Funds and Industry Fund, "Funds") maintain their principal place of business and are administered from offices located in Pennsylvania.

16.     Plaintiff Shawn McCullough ("McCullough" and together with the Funds, "Plaintiffs") is a fiduciary with respect to the Welfare Fund, Pension Fund, Annuity Fund, and

Apprenticeship Fund within the meaning of 29 U.S.C. 1002(21), Chairman of the Industry Fund, and President and Business Manager of the Union, with a business address as listed in the caption. He is authorized to bring this action on behalf of all Trustees of the Welfare Fund, Pension Fund, Annuity Fund, and Apprenticeship Fund, as well as the Industry Fund, and Union.

17.     Union Roofing Contractors, Inc. d/b/a Union Roofing d/b/a Union Roofing & Sheet Metal Contractors, Inc. ("Union Roofing") is a Pennsylvania corporation and an employer in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(2), (6) and (7), 1002(5), (11) and (12) with a business office or registered agent at the address listed in the caption.

18.     Defendant Frank Lubisky ("Lubisky") is an individual engaged in the conduct of personal construction enterprise. Upon information and belief, Lubisky uses the trade names Philly Roofing, C.R. Thompson Roofing, and the corporation under his ownership and control, Union Roofing, in the conduct of his construction business. Lubisky has a business or residential address as listed in the caption.

### Alter Ego, Single Employer, or Successor Facts

19.     Defendant C.R. Thompson Roofing d/b/a C.R. Thompson Roofing Company ("Thompson") is an unincorporated enterprise or organization owned and controlled by Lubisky, and is sued in its common name under Federal Rule of Civil Procedure 17(b). Thompson is an alter ego of Union Roofing or single employer or successor in combination with Lubisky and the other Defendants with respect to the fringe benefits and audit at issue in this Complaint.

20.     Defendant Philly Roofing (together with Union Roofing, and Thompson, "Companies," and Companies together with Lubisky, "Defendants") is an unincorporated enterprise or organization owned and controlled by Lubisky, and is sued in its common name under Federal

Rule of Civil Procedure 17(b).  Philly Roofing is an alter ego of Union Roofing or single employer or successor in combination with Lubisky and the other Defendants with respect to the fringe benefits and audit at issue in this Complaint.

21.     At all times relevant to this Complaint, Lubisky owned the Companies.

22.     At all times relevant to this Complaint, the Companies operated out of the same business location.

23.     Upon information and belief, at all times relevant to this Complaint, the Companies had substantially identical owner(s), officers, and management.

24.     Upon information and belief, at all times relevant to this Complaint, the same individuals handled labor relations for all the Companies.

25.     Upon information and belief, at all times relevant to this Complaint, the Companies had substantially identical supervision.

26.     Upon information and belief, at all times relevant to this Complaint, the Companies had substantially identical business purpose, and were engaged in the same or essentially the same business as one another.

27.     Upon information and belief, at all times relevant to this Complaint, the Companies had substantially identical operations.

28.     Upon information and belief, at all times relevant to this Complaint, the Companies shared a common roster of employees who worked for each of the Companies and performed covered work as defined by the Labor Contract.

29.     Upon information and belief, at all times relevant to this Complaint, the Companies shared the same equipment.

30.     Upon information and belief, at all times relevant to this Complaint, the Companies

served the same, same type, or similar customers.

31.    Upon information and belief, the Companies acted as a single integrated enterprise. There was never an arm's length relationship among or between them.

32.    Upon information and belief, at all times relevant to this Complaint, Philly Roofing and Thompson had notice of Union Roofing's fringe benefit reporting and contribution obligations to the Funds

33.    Upon information and belief, Lubisky exerted direct and significant control over the terms and conditions of employment of the Companies' employees.

## COMMON FACTS

34.    At all times relevant to this action, Union Roofing was party to or agreed to abide by the terms and conditions of a collective bargaining agreement(s) with the Union (singly or jointly, "Labor Contract"). A true and correct copy of the Labor Contract to which Company is bound and a signature/assent page are attached collectively as Exhibit 1.

35.    Union Roofing also signed or agreed to abide by the terms of the agreements and declarations of trust of the ERISA Funds, as from time to time amended ("Trust Agreements"), made between certain employers and employee representatives in an industry(ies) affecting interstate commerce to promote stable and peaceful labor relations. Ex. 1, Labor Contract, Art. XXV (Welfare Fund), Art. XXVI (Pension Fund), Art. XXVII (Vacation Fund), Art. XXVIII (Annuity Fund), Art. XXIX (Industry Fund), Art. XXX (Dues Checkoff), Art. XXXI (Apprenticeship Fund), and Art. XXXII (PAC).

36.    Under the Labor Contract, incorporated Trust Agreements, and applicable law, Union Roofing agreed:

      (a)     To make full and timely payments on a regular basis to the Funds, as required by the Labor Contract, Trust Agreements, and plan documents. Ex. 1, Labor Contract, Art. XXV (Welfare Fund), Art. XXVI (Pension Fund), Art. XXVII (Vacation Fund), Art. XXVIII (Annuity Fund), Art. XXIX (Industry Fund), Art. XXX (Dues Checkoff), Art. XXXI (Apprenticeship Fund), and Art. XXXII (PAC).

      (b)     To file timely remittance reports with the Funds detailing all employees or work for which contributions were required under the Labor Contract. Ex. 1, Art. XXXIII, §§ 1-2.

      (c)     To produce, upon request by the Funds, all books and records deemed necessary to conduct an audit of Union Roofing's records concerning its obligations to the Funds and to pay the cost of the audit if found to be delinquent or in violation of the Labor Contract, Trust Agreements, or plan documents. Ex. 1, Article XXXIII. § 2(g).

      (d)     To pay liquidated damages, interest, audit costs, and all costs of litigation, including attorneys' fees, expended by the Funds to collect any amounts due as a consequence of its failure to comply with its contractual and statutory obligations described in Subparagraphs (a), (b) and (c). Ex. 1, Art. XXXIII, § 2(b).

      (e)     That when contributions become due and payable to the Funds, these amounts become plan assets of the Funds.

### Failure or Refusal to Comply With Audit Request

37.     By letter dated December 28, 2016, after several requests by the Funds' auditor, Plaintiffs' Counsel requested that Union Roofing and Lubisky provide the following records necessary for the Funds' auditor to conduct an audit: general ledgers; bank statements and

cancelled checks; W-2 and W-3 forms; state and federal quarterly tax returns; 1099 and 1096

forms; all subcontracting invoices; and labor by job reports.

38. By letter dated March 11, 2017, the Funds' auditor requested the following

records from Union Roofing and Lubisky, which Union Roofing and Lubisky had yet to provide:

all Forms W-2, W-3, and Quarterly Tax Returns; cancelled checks for all bank accounts owned

and operated by Union Roofing; detailed general ledgers and trial balance; Forms 1099 and

1096; and paid subcontractor invoices for all subcontractors.

39. By correspondence dated October 11, 2018, the Funds' auditor requested all

payroll and related records for Union Roofing, Thompson, Philly Roofing, and Union Roofing &

Sheet Metal Contractors, Inc.

40. As of the date of the filing of this Complaint, Union Roofing and Lubisky have

failed or refused to comply with Plaintiffs' audit requests in ¶¶ 37-39.

41. Plaintiffs reserve the right, during the course of this litigation, to request an audit

of the Companies' books and records for the period January 1, 2016 through the date of such

audit.

42. Plaintiffs reserve the right, during the course of this litigation, to audit the books

and records for all other currently unknown entities related to Defendants, which also perform

covered work under the Labor Contract and may be discovered during the course of the

requested audit and/or this litigation.

43. All conditions precedent to this lawsuit or the relief it seeks have been satisfied.

## COUNT I - AUDIT

## PLAINTIFFS

### v.

## COMPANIES

44.     The allegations of Paragraph 1 through 43 are incorporated by reference as if fully restated.

45.     The Companies are obligated to permit the Plaintiffs to audit their records and to cooperate in determining the contributions due to the Plaintiffs.

46.     The amount of contributions and dues the Companies are required to pay to the Plaintiffs is based on hours worked and wages paid to employees performing work covered by the Labor Contract.

47.     Plaintiffs are without sufficient information or knowledge to plead the precise nature, extent, and amount of the Companies' delinquency since the books, records, and information necessary to determine this liability are in the exclusive possession, custody, and control or knowledge of Defendants.

48.     An audit of the Companies' books and records for the period January 1, 2014 through December 31, 2015 has not been completed because Defendants have refused to provide the Funds' auditors all of the necessary records and information as required by the Labor Contract, Trust Agreements, and applicable law.

49.     Computation of the precise amount of an employer's delinquency is normally achieved by an audit of the employer's books and records and/or calculated from contractually-required remittance reports submitted by the employer.

50.     The Companies are required by the Labor Contract, Trust Agreements, and applicable law to permit the Funds to audit the records and to cooperate in determining the contributions due to the Plaintiffs.

51.     The Plaintiffs have no adequate remedy at law because the calculation of any damages suffered as a result of the breach itself requires an audit.

**WHEREFORE**, Plaintiffs ask that the Court:

(1)     Declare that Union Roofing, Thompson, and Philly Roofing are alter egos or a single employer or that Philly Roofing and Thompson are successors of Union Roofing, but in any case, that each and all are bound to all terms and conditions of the Labor Contract and are individually, jointly, and severally liable to the Funds.

(2)     Enjoin Defendants, their officers, agents, servants, employees, attorneys, and all others in active concert or participation with them to permit an audit of all records under their actual or constructive control for the period January 1, 2014 through December 31, 2015 and, in the absence of records, to cooperate in alternative methods for the determination of work for which contributions are due.

(3)     Grant such other or further relief, legal or equitable, as may be just, necessary or appropriate.

## COUNT II - CONTRIBUTIONS DUE UNDER ERISA AFTER AUDIT

### PLAINTIFFS

### v.

### COMPANIES

52.     The allegations of Paragraphs 1 through 51 are incorporated by reference as if fully restated.

53.     The Companies have failed to make contributions to the ERISA Funds in violation of 29 U.S.C. § 1145.

54.     The ERISA Funds are without sufficient information or knowledge to plead the precise nature, extent, and amount of the Companies' delinquency since the books, records, and information necessary to determine this liability are in Defendants' possession, custody, control, or knowledge.

55.     The ERISA Funds have been damaged by the Companies' violation of 29 U.S.C. § 1145.

**WHEREFORE**, Plaintiffs ask that the Court:

(1)     Declare that Union Roofing, Thompson, and Philly Roofing are alter egos or a single employer or that Philly Roofing and Thompson are successors of Union Roofing, but in any case, that each and all are bound to all terms and conditions of the Labor Contract and are individually, jointly, and severally liable to the Funds.

(2)     After an audit, enter judgment against the Companies in favor of the ERISA Funds, jointly and severally, for the contributions found due and owing by the audit, together with interest at the rate prescribed by 26 U.S.C. § 6621 from the due date for payment until the date of actual payment, liquidated damages equal to the greater of the interest on the unpaid contributions or liquidated damages provided by the plan documents or statute, and reasonable attorneys' fees and costs incurred in this action and in connection with any proceeding to enforce or collect any judgment.

(2)     Grant such other or further relief, legal or equitable, as may be just, necessary or appropriate.

## COUNT III – AMOUNTS DUE UNDER CONTRACT AFTER AUDIT

### PLAINTIFFS

#### v.

### COMPANIES

56.     The allegations of Paragraphs 1 through 55 are incorporated by reference as if fully restated.

57.     The Companies have failed to make contributions to the Plaintiffs as required by the Labor Contract or Trust Agreements.

58.     The Funds are without sufficient information or knowledge to plead the precise nature, extent, and amount of the Companies' delinquency since the books, records, and information necessary to determine this liability are in Defendants' possession, custody, control, or knowledge.

59.     The Plaintiffs have been damaged by the Companies' failure to make contributions as required by the Labor Contract or Trust Agreements.

**WHEREFORE**, Plaintiffs ask that the Court:

(1)     Declare that Union Roofing, Thompson, and Philly Roofing are alter egos or single employers or that Philly Roofing and Thompson are successors of Union Roofing, but in any case, that each and all are bound to all terms and conditions of the Labor Contract and are individually, jointly, and severally liable to the Funds.

(2)     After an audit, enter judgment against the Companies in favor of the Plaintiffs, jointly and severally, for the amount of contributions found due and owing by an audit together with liquidated damages, interest, and costs, including reasonable attorneys' fees incurred in this

action or the collection and enforcement of any judgment, as provided in the Labor Contract or Trust Agreements.

(2)    Grant such other or further relief, legal or equitable, as may be just, necessary or appropriate.

## COUNT IV – BREACH OF FIDUCIARY OBLIGATIONS

## PENSION FUND, ANNUITY FUND, AND WELFARE FUND

### v.

### LUBISKY

60.    The allegations of Paragraphs 1 through 59 are incorporated by reference as if fully restated.

61.    At such time as contributions became due and payable by the Companies to the Pension Fund, Annuity Fund, and Welfare Fund, such amounts became assets of the Pension Plan, Annuity Plan, and Welfare Plan under and pursuant to the terms of the Trust Agreements and applicable law.

62.    Lubisky, as owner, principal, and President of the Companies, as well as the individual who signed the Labor Contract on behalf of Union Roofing, was responsible for submitting monthly remittance reports to the Funds setting forth the total amount of fringe benefit contributions the Companies owed resulting from his employees who performed covered work under the Labor Contract.

63.    Lubisky had and has the authority to make decisions as to what obligations and/or payments of the Companies are/were to be paid to the Funds, including the authority to make payments for his own personal benefit.

64.    Lubisky has and had authority to determine when the Companies would pay

contributions to the Funds.

65.     Lubisky decided the Companies' financial operations and oversaw its business activities.

66.     When the Companies' employees performed covered work as defined in the Labor Contract, contributions became due and owing to the Funds, and upon Lubisky's refusal to make timely payment of those contributions to the Funds, Lubiksy exercised authority over disposition of funds that had become Pension Plan, Annuity Plan, and Welfare Plan assets.

67.     Lubisky intentionally and willfully chose to use the monies owed for fringe benefit contributions for purposes other than paying contributions to the Funds.

68.     Lubisky is a fiduciary with respect to the Pension Plan, Annuity Plan, and Welfare Plan under 29 U.S.C. § 1002(21) with respect to amounts not paid to the Funds by reason of his possession, authority, and control regarding the management or disposition of plan assets with respect to assets of the Pension Plan, Annuity Plan, and Welfare Plan in his possession.

69.     As custodian and fiduciary in possession of Pension Plan, Annuity Plan, and Welfare Plan assets, Lubisky had a duty to prudently safeguard the plan assets, to place them in trust apart from the assets of the Companies as soon as practicable, and deliver them to the Funds, on demand or earlier, and to account for assets received and earning or profits thereon under 29 U.S.C. §§ 1104 and 1103(a).

70.     Lubisky violated 29 U.S.C. §§ 1104 and 1103(a), and adversely affected or damaged the Pension Plan, Annuity Plan, Welfare Plan and/or their participants or beneficiaries by retaining plan assets and/or diverting plan assets to uses other than paying contributions to the Funds.

71.     The Pension Plan, Annuity Plan, and Welfare Plan are adversely affected by Lubisky's acts or omission in violation of 29 U.S.C. §§ 1104 and 1103(a).

**WHEREFORE**, Plaintiffs ask that the Court:

(1)     Require Lubisky and his agents, servants, employees, attorneys, fiduciaries, and persons in active concert or participation with him, to comply with governing law and the terms of the Fund's plans and benefits with respect to the care and custody of Plan assets and accounting for the custody and earnings of Plan assets;

(2)     Require Lubisky to make the Pension Fund, Annuity Fund, and Welfare Fund whole for any losses resulting from Lubsky's breach of fiduciary duty, and to restore to the Pension Plan, Annuity Plan, and Welfare Plan any profits which have been made through the use of Plan assets; and

(3)     Grant such other equitable or remedial relief as the Court may deem appropriate.


Respectfully submitted,

JENNINGS SIGMOND, P.C.


BY:

RYAN P. McCARTHY (ID No. 323125)
MARC GELMAN (ID No. 78857)
1835 Market Street, Suite 2800
Philadelphia, PA 19103
Phone: (215) 351-0664
Fax: (215) 922-3524
rmccarthy@jslex.com

Date:   January 3, 2019            Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Board of Trustees, Roofers Union Local 30 | : | CIVIL ACTION |
| Combined Health and Welfare Fund, et al. | : | |
| v. | : | |
| Union Roofing Contractors, Inc., et al. | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (X)


| | | |
|---|---|---|
| 12/31/2018 | | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-351-0644 | 215-922-3524 | rmccarthy@jslex.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Board of Trustees, Roofers Union Local 30 Combined Health and Welfare Fund, et al. | Union Roofing Contractors, Inc., et al. |

**(b)** County of Residence of First Listed Plaintiff   Philadelphia, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ryan McCarthy, Esq., Jennings Sigmond, P.C., 1835 Market Street, Suite 2800, Philadelphia, PA 19103, 215-351-0644

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☒ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. §§ 1132, 1145; 29 U.S.C. § 185(a); and/or 28 U.S.C. § 1331

Brief description of cause:
collection to funds due under ERISA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
01/03/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: __6447 Torresdale Avenue, Philadelphia, PA 19128__

Address of Defendant: __12260 Townsend Road, Philadelphia, PA 19154__

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __01/03/2019__      _signature_      __323125__
_Attorney-at-Law / Pro Se Plaintiff_      _Attorney I.D. # (if applicable)_

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* _____ERISA_____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Ryan McCarthy__, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: __01/03/2019__      _signature_      __323125__
_Attorney-at-Law / Pro Se Plaintiff_      _Attorney I.D. # (if applicable)_

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

# COLLECTIVE BARGAINING AGREEMENT

## BY AND BETWEEN

## ROOFERS LOCAL 30
## AND
## ROOFING CONTRACTORS' ASSOCIATION

## COVERING

## COMMERCIAL ROOFING and
## COMMERCIAL REROOFING

## MAY 1, 2014 THROUGH APRIL 30, 2016



EXHIBIT
1

# WORKING AGREEMENT

## ARTICLE I
### Particulars of Agreement

THE PURPOSE of this Agreement is: To define wages and working conditions, prescribe means for the prevention of strikes, lockouts or other stoppages of work and to otherwise stabilize operations in the composition roofing, dampproofing and waterproofing industry in Philadelphia and vicinity.

THE PARTIES to the Agreement are the Roofing Contractors' Association (hereinafter called the "Employer," "Association" or "RCA"), its member Employers, party of the first part, and Local Union No. 30 of the United Union of Roofers, Waterproofers, and Allied Workers (hereinafter called the "Union"), party of the second part.

The CO-PARTIES of the first part to this Agreement are: Any and all composition roofing, dampproofing and waterproofing contractor non-members of the Association operating in the territory covered by this Agreement, who shall have severally signified their acceptance hereof by affixing their several signatures to a true copy of this Agreement.

The term "Employer" shall be construed to include any and all member Employers of the Association and/or co- parties of the first part hereto; and the term "Employee" shall be construed to include all persons employed within the collective bargaining unit represented by the Union.

## ARTICLE II
### Agreement

**Section 1.**  Pursuant to the purposes above set forth, the Association, acting for and on behalf of itself as well as for and on behalf of its member Employers, together with the co-parties of the first part hereto, do jointly and severally covenant and agree that they will perform no work within the jurisdiction and scope of this collective bargaining agreement which in any way involves payment of lower wages, traveling time/expense, fringe benefits or involves terms and conditions of employment other than those contained in this Agreement; that they will be bound and abide by the following Articles of Agreement, all and several upon any and all commercial roofing work and as hereinafter specified as subject to the operation of this Agreement, contracted or performed by them or any of them during the life hereof.  The collective bargaining agreement and subsequent extensions, changes and renegotiations shall continue to be applicable and binding on non-members of the Association who have executed an assent.  This Section I shall not apply to instances in which relief is granted under the provisions set forth in Article XXXVIII.

**Section 2.**  The Union agrees that it shall not authorize or permit any signatory Employer to perform work within the trade and geographic jurisdiction of this Agreement according to terms and conditions which are more favorable than those set forth in this Agreement without offering those terms and conditions to all other signatory Employers.  Any disputes arising under this Section may be submitted for resolution pursuant to the grievance and arbitration process set forth in Article VIII hereof, at the Employer's discretion.

This section shall not apply:
(1)   When the Union agrees to permit a non-union Employer to complete projects in progress according to terms and conditions which are more favorable than those set forth in this Agreement in exchange for that Employer's execution of this Agreement; or
(2)   When the Union agrees to permit an Employer to complete a given project according to terms and conditions which are more favorable than those set forth in this Agreement because that Employer is experiencing severe financial hardship on that project; or

2

(3) To agreements with public authorities similar to the agreement by and between the Union and the Philadelphia Housing Authority.

**Section 3**. Once a signatory Employer has begun a job, no other signatory Employer shall complete the said job as a subcontractor or assignee of the original Employer until all wages, Welfare, Pension, Vacation, Annuity and other applicable Fund contributions due to, or on behalf of, all employees who worked for the first Employer shall first have been paid. This requirement may be waived only by the Board of Trustees of the Roofers Local 30 Combined Pension, Welfare and Annuity Funds.

**Section 4**. The parties agree that it is necessary and lawful to protect and preserve for the employees covered by this Agreement all work heretofore performed by them. Therefore, in order to prevent any device or subterfuge used by an Employer to avoid its obligations under this Agreement, the Employers and the Union agree that, effective upon the execution of this Agreement: If and when an Employer bound by this Agreement shall perform any work within the trade and geographic jurisdiction of this Agreement, under its own name or through the use of an "alter-ego," the terms and conditions of this Agreement shall be applicable to all such work.

**Section 5**. This Agreement shall apply to all persons, whether commercial journeymen, commercial apprentices or foremen and all members in the bargaining unit (any or all of whom are sometimes hereafter referred to as "employees"), who are at any time engaged in the territory described in Article V hereof in performing for any Employer work covered by this Agreement. The parties are cognizant of a history within the industry whereby some Employers have attempted to use separate agreements to perform commercial roofing work and, as a result thereof, variances in the amounts of wages, benefits and terms and conditions of employment for commercial journeymen roofers have heretofore existed. The parties signatory to this Agreement firmly agree that such conduct shall no longer be tolerated and that this Agreement is intended by all parties hereto to establish the only wages, hours and terms and conditions of employment that any signatory Employer may pay to its workmen performing commercial roofing work within the trade and geographic jurisdiction of this Agreement.

(a) **Penalties**. The parties agree that, in addition to any and all remedies otherwise available to the Union under this Agreement, including but not limited to the penalties set forth in Article XXXVII, an Employer who is found to have violated any of the prohibitions set forth in this Section 5 shall also be responsible for payment of any and all costs of litigation incurred by the Union which are required to enforce a determination by the Joint Conference Board or an arbitrator, including reasonable attorneys' fees.

## ARTICLE III
### Recognition & Union Security Clause

**Section 1.** The Union recognizes the Roofing Contractors' Association as the exclusive collective bargaining representative and agent under the terms of this Agreement for all of its present and future members. The Roofing Contractors' Association recognizes the Union as the exclusive bargaining representative for all journeymen roofers, apprentices and foremen and all employees performing commercial roofing work, within the jurisdiction of the Union.

Inasmuch as the Union has demanded recognition from the Employer as the exclusive bargaining representative of the Employer's employees in the bargaining unit described herein under Section 9(a) of the National Labor Relations Act, and the Employer is satisfied and has verified that the Union represents a majority of its employees in the bargaining unit described herein, the Employer hereby recognizes the Union as the exclusive collective bargaining representative of its employees on all present and future job sites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the employee's exclusive representative.

**Section 2.** All journeymen roofers who at the time of the signing of this Agreement are members of the Union shall, as a condition of continued employment, maintain their membership in good standing in the

3

Union. All journeymen roofers who at the time of the signing of this Agreement are not as yet members of the Union shall, after seven (7) days following the effective date of this Agreement, become members of and maintain membership in the Union in good standing as a condition of continued employment. All newly hired journeymen shall, as a condition of continued employment, become members of the Union in good standing after seven (7) days following the date of hire or the effective date of this Agreement, whichever is later; upon becoming members of the Union in good standing, such journeymen shall maintain membership in good standing as a condition of continued employment. In computing the seven (7) day period hereinbefore referred to and described, days of employment with the same Employer, who has an agreement with the Union, shall be accumulated.

## ARTICLE IV
### Agency Shop Provision for Apprentices

**Section 1.** Membership in the Union is not compulsory for apprentices who shall, nevertheless, have the right to join, not join, maintain or drop their membership in the Union, as they see fit. Neither party shall exert any pressure on or discriminate against an apprentice as regards such matters.

**Section 2.** All such individuals who presently are not Union members and who do not in the future become and remain members shall, after seven (7) days following the effective date of this Agreement and as a condition of employment, pay to the Union each month a service charge as a contribution towards the administration of this Agreement in an amount equal to the regular monthly dues (not including initiation fees, fines, assessments or any other charges uniformly required as a condition of acquiring or maintaining membership) of the Union.

**Section 3.** All newly hired apprentices shall, after seven (7) days following the date of hire or the effective date of this Agreement, whichever is the later, and as a condition of continued employment, pay to the Union each month a service charge as a contribution towards the administration of this Agreement in an amount equal to the regular monthly dues (not including initiation fees, fines, assessments or any other charges uniformly required as a condition of acquiring or retaining membership) of the Union.

**Section 4.** In computing the seven (7) day period hereinbefore referred to and described, days of employment with the same Employer, who has an Agreement with the Union, shall be accumulated.

**Section 5.** Upon failure of any apprentice to pay or tender the above-mentioned service charge, the Employer will discharge such employee when so informed by the Union.

**Section 6.** Membership in the Union is separate, apart and distinct from the assumption by one of its equal benefits. The Union is required under this Agreement to represent all the employees in the bargaining unit fairly and equally without regard as to whether or not an employee is a member of a Union. The terms of this Agreement have been made for all employees in the bargaining unit and not only for members in the Union. Accordingly, it is fair that each employee in the bargaining unit pay his own way and assume his fair share of his obligation along with the grant of equal benefit contained in this Agreement.

4

# ARTICLE V
## Scope of Agreement

**Section 1**. This Agreement shall apply to all workmen performing the work of journeymen or apprentices on all commercial new and commercial reroofing work, including work on all apartment houses and all other roofing and waterproofing work other than single house dwellings.   In addition this Agreement, whether or not specifically referenced herein, also encompasses all trade jurisdiction work identified and specified in Article II, Section 3, 4, 5, 6 and 7 of the Constitution and By-Laws of the United Union of Roofers, Waterproofers and Allied Workers (as adopted, 1993 Convention).

**Section 2.**   This Agreement shall be operative within the confines of Pennsylvania, Delaware and New Jersey as follows: the counties of Adams, Berks, Bucks, Carbon, Centre, Chester, Columbia, Cumberland, Dauphin, Delaware, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montgomery, Montour, Northampton, Northumberland, Perry, Philadelphia, Schuylkill, Snyder, Union, York and all of Monroe County with the exception of Tobyhanna Army Depot and the township of White Haven in Luzerne County, as well as, the part of Luzerne County south of Interstate 80 in Pennsylvania; the counties of Kent, New Castle and Sussex in Delaware; the counties of Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Hunterdon, Mercer, Ocean, Salem, Trenton and part of the counties of Middlesex, Monmouth and Somerset in New Jersey; and in accordance with territorial descriptions on file with the International Union.

**Section 3.**   Except as otherwise hereinafter provided, this Agreement shall be operative on any day and all work upon delivery to hoist or to point of operation if on ground in unloading, handling and applying of any or all of the following materials, namely:
    (a)        All Spandrel and through-wall flashing;
    (b)        All compressed or chemical prepared paper, fabric, membrane, fiberglass, rubber, plastic, vapor barrier or other substitutions, including dry sheet, and all burlap, ducking or other fabric, prepared or otherwise, when used for roofing or dampproofing or waterproofing purposes, together with all coating thereof except Visqueen and Polyethlene used under floor slabs;
    (c)        All bituminous or other dampproofing or damp-resisting and/or waterproofing preparations when applied with a mop, swab, sprayer, trowel, roller or brush and all primer in connection with roofing or dampproofing or waterproofing work. This provision, along with (b) above, shall not pertain to metallic or ironite waterproofing when used in elevator or escalator shafts or pits;
    (d)        All gravel, slag, ballast, pavers (including concrete pavers), rigid insulation when used under membrane roofing or with dampproofing and waterproofing. Nailboard when used with vapor barrier, single-ply, built-up, modified bituminous, sheet or liquid roofing or   when used as a roofing, dampproofing or waterproofing base or vapor barrier and including insulation when used on inside or outside walls;
    (e)        All vapor barrier, single-ply, built-up, modified bituminous, and liquid or sheet applied roofing, dampproofing or waterproofing systems.
    (f)        All roofing, dampproofing and/or waterproofing plastics whether sprayed on, brushed on or applied in any other fashion. The roofing contractor shall have the right to assign to others or to use Local 30 members to provide interior protection from dust, dirt and falling debris;
    (g)        All work in connection with the removal of roofing   materials covered under this Agreement and resultant debris, tearing off and scraping off of old roofing, as well as ripping off all tile work in conjunction with the application of a new roof at the same deck location;
    (h)        All work in regard to the cutting of holes in roofing membrane and/or rigid roof insulation board and all materials covered by this Agreement and the patching of the same except where done in connection with the installation of an occasional pipe of minimal size or the cutting of occasional holes.
    (i)        It is specifically understood that the coverage of this agreement includes all work pertaining to the operation of tankers, kettles, melters, vacuum machine, and other instrumentalities performing similar functions.
    (j)        Any moisture and/or chemically resistant lining (sheet or fluid applied) installed to contain (or supplement containment) fluids and/or slurries in connection with the following: reservoirs, ponds, lagoons, tanks, sluices/troughs/aqueducts, pipes and land disposal facilities including liners and covers;

5

(k)      Roofers shall operate any and all machinery owned or leased by an Employer which is used at the job site in connection with loading, unloading, application, and cleanup and removal of all roofing and/or waterproofing systems.   This requirement shall not apply to the operation of a daily rented crane or boom truck.

(l)      Membrane used as air barrier, termination bar, R-MER-LITE type roofing system, composite board consisting of plywood, particle board or homasote bonded to insulation and any and all insulation applied on top of a roof deck when put down in conjunction with any membrane covered by item (e) above.

(m)      All forms of protection boards, walkway pads and roof treads used in composition roofing or waterproofing to protect the membrane from damage.

(n)      All components of "living roof" systems, including but not limited to membranes, insulations, filters, fleece, vegetation blankets and/or trays and soils.

(o)      All solar or photovoltaic cell-type structures, modules, panels or units that are used as substitutes for ballast or membrane protection, including Inverted Roof Membrane Assembly (IRMA) roofs or roofs of similar construction.

(p)      All roof integrated solar or photovoltaic cell-type systems, structures, modules or panels used to transform solar energy into electrical energy when applied to or installed on any existing or new roofing system.

**Section 4**.   The Union shall only represent employees performing roofing, damp or waterproofing work for Employers having signed contracts with the Union; nor shall any person represented by the Union be permitted to take or do any roofing, damp or waterproofing on their own account.   This shall include, but is not restricted to, Saturdays, Sundays and holidays.   This shall also apply to any person registered on the referral list maintained by the Union in accordance with the legal hiring arrangement hereinafter more fully set forth.

**Section 5.**   All tools, materials and other equipment must be transported by the Employer or his agent. .

**Section 6.** The Union agrees to notify the Association, within two (2) weeks, of all non-Association Employers who sign a collective bargaining agreement with the Union.   The Union agrees further to notify the Association immediately in the event that any Employer with whom it has a collective bargaining agreement goes out of business or otherwise terminates its operations.

**Section 7**.   Employers shall, at the time of signing any roofing contract, notify the Union when any work covered by this Agreement is withheld from the roofing contractor by the owner, customer, general contractor or other entity.

(a)   No spandrel will be delivered to a job site before a roofing journeyman crew has arrived at the site.

**Section 8**.   All work covered by this Agreement which is to be performed at the job site shall not be subcontracted, sublet or turned over by an Employer who is a party to this Agreement to any other Employer who is not also a party to this Agreement. Before subcontracting, subletting or turning over work the Employer shall first check with the Union to ascertain if the other Employer is also a party to this Agreement.

In addition to, but not in limitation of the foregoing, an Employer that is signatory to this Agreement shall not subcontract any form of roofing and waterproofing work that is covered by the Local 30 Residential, Shingle, Slate and Tile Agreement, unless the Employer to whom such work is subcontracted is signatory to the appropriate Local 30 Agreement.

The Union shall not permit a signatory Employer that is delinquent in its reporting or payment obligations to the Local 30 Combined Benefit Funds as described in Article XXXIII to complete any work covered by the Agreement by subcontracting the work or otherwise assigning the work to another signatory Employer and no other signatory Employer shall complete said job as a subcontractor or assignee to the delinquent Employer until all reports have been filed with the Funds and all Welfare, Pension, Vacation, Annuity and other applicable Fund contributions due to, or on behalf of, all employees who worked for the first

6

Employer on the job shall first have been paid. This requirement may be waived only by the Board of Trustees of the Roofers Local 30 Combined Benefit Funds.

## ARTICLE VI
### Hiring

**Section 1.** In the interest of maintaining an efficient system of production in the Industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interests of employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment on commercial roofing projects.

**Section 2.** The Union shall be the sole and exclusive source of referral of applicants for employment.

**Section 3.** The Employer shall have the right to reject any applicant for employment.

**Section 4.** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, by-laws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the procedure set forth in this Article.

**Section 5.** The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

**GROUP I.** All commercial journeymen applicants for employment who: (1) have four or more years' experience in the trade; (2) are residents of the geographical area constituting the normal construction labor market; and (3) who have been employed for a period of at least one year in the last seven years performing commercial roofing for a contractor bound by a collective bargaining agreement with the Union.

**GROUP II.** All commercial journeymen applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market and who have been employed for at least six months in the last six years performing commercial roofing for a contractor bound by a collective bargaining agreement with the Union.

**GROUP III.** All other commercial journeymen applicants for employment. Wherever the term "commercial journeyman" or "journeyman" is used in this Referral Procedure, the term shall mean a person who has: (1) demonstrated that he/she has 8,000 or more hours experience in the trade; or (2) has been certified as a commercial journeyman by a duly qualified Apprentice Program established by the Union or a union affiliated with the International Union; or (3) passes a hands-on commercial roofing skills exam administered by the Joint Apprentice Committee.

**Section 6.** "Normal construction labor market" is defined to mean the area set forth in Article V, Section 2 of this Agreement, plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured. The above geographic area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which the Agreement applies.

**Section 7.** "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

7

**Section 8**.  "Experience in the trade" or "in the trade" as used herein means roofing and re-roofing work on commercial roofing projects.   Residential roofing, residential reroofing and slate, tile and shingle experience shall not be construed as "experience in the trade" for purposes of this Article.

**Section 9**.  "Year," "years" or "years' experience" as used herein shall mean at least 2,000 hours of work in a calendar year.   A person seeking to establish "four or more years' experience in the trade" may, alternatively, establish satisfaction of this requirement by demonstrating that he/she has worked a minimum of 8,000 hours "in the trade."

**Section 10**.   The Union shall maintain an "Out of Work List" which shall list the applicants within each Group in chronological order of the dates and time they register their availability for employment.

**Section 11.**  An applicant must be present in the Hiring Hall to be eligible for referral.

**Section 12**.   Order of Referral.   Employer shall advise the Business Manager, or his designee, of the number of applicants needed.    The Employer may request a foreman and crew suitable to the Employer's particular job in accordance with the procedure set forth below.   An Employer has a right to request a specific employee subject to the limitations set forth below.   Except as otherwise set forth in Section 18, the following procedure shall govern the selection and referral process.

Applicants shall be referred to employment in accordance with the following process.

(a)   The Employer shall appoint one qualified journeyman from Group I as foreman.   If no Group I applicants are available for work at the time, the foreman shall be selected from Group II.
(b)   The foreman shall select applicants for the job from Group I. If no applicants for employment remain in Group I, then the foreman shall select the remaining members of the crew from Group II.   If no applicants from Group II are available, the foreman shall select from Group III.
Under no circumstances shall an applicant registered in a lower priority group be referred while a member of a higher priority group is available for work.   The foreman's selection of a crew from available applicants shall be subject to his discretion in fulfilling the Employer's needs.
(c)   In the event the Employer or foreman determines that he has no preference among available applicants, then the Business Manager or his designee shall refer applicants to the Employer by first referring applicants in Group I in the order of their place on the "out-of-work list" and then referring applicants in the same manner successively from the "out-of-work list" in Group II, then Group III.

In circumstances where the Employer states bona fide requirements for special skills and abilities (including requests encompassed by Section 18 hereof) in its request for applicants, the Business Manager or his designee shall refer the first applicant on the register possessing such skills and abilities.   Any applicant who is rejected by the Employer shall be returned to his appropriate place within his Group and shall be referred to other employment in accordance with the position of his Group and his place within his Group.

**Section 13**.   A representative of the Employer or of the Association, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

**Section 14.**   A copy of this Referral Procedure shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

**Section 15**.   Apprentices shall be hired in accordance with the apprenticeship provisions of the Agreement between the parties.

**Section 16**.   The Employer shall have the right to select applicants on the out-of-work list without regard to chronological order or group status when it is required to meet affirmative action requirements regarding minority and female employees.   In such circumstances, the Employer shall be required to provide the Business Manager or his designee with a minimum of two working days written notice of such matter.   In

8

the event the Union cannot provide suitable personnel to enable the Employer to satisfy affirmative action requirements, the Employer shall be permitted to seek employees elsewhere in order to comply with the law. In such event, employees hired directly by the Employer shall have a status of temporary employees and shall be laid off upon completion of the project for which they were initially hired.   All such temporary employees shall be required to register at the Union Hall before reporting for work.   For purposes of the notice provision set forth herein, Saturdays, Sundays and holidays shall not be counted in the computation of 48 hours.

**Section 17.**   The Employer shall have the right to recall a former employee who was laid off by him within thirty (30) calendar days following the layoff upon written notice to the Business Manager.   In such event, the employee may be recalled, notwithstanding the provisions set forth in this Article.

**Section 18.**   In the event the Union, through its Hiring Hall, is unable to provide sufficient workers to satisfy an Employer's needs the Employer may, subject to the following conditions, hire temporary employees. Upon notification from the Business Manager or his designee that the Union cannot fulfill its request for workmen, the   Employer shall provide the Business Manager with a written notice that it will seek to hire temporary employees from other sources following the passage of forty-eight (48) hours.   If the Union can fulfill the Employer's needs within forty-eight (48) hours following receipt of the written notice from the Employer, the Employer may not hire employees from other sources.   If the Employer's needs remain unfulfilled following the forty-eight (48) hour written notice to the Business Manager, the Employer may hire employees from any source provided that such employees shall be designated temporary and shall be laid off upon completion of the project for which they were initially hired.   All such temporary employees shall be required to register at the Union Hall prior to reporting for work.   For purposes of the notice provision set forth herein, Saturdays, Sundays and holidays shall not be counted in the computation of 48 hours.

**Section 19.**   This hiring arrangement is subject to modification in the event that it becomes legally necessary to make such modification based upon binding decisions of the National Labor Relations Board and/or in the event of the issuance of any binding court decisions relating thereto.

**Section 20.**   The Union represents that it shall be the sole administrator of the hiring hall arrangement described herein as principal and said Union shall not be construed to act as the agent of the Association or any Employer in connection therewith.   In the administration of said hiring hall, the Union shall be liable for such violations, if any, which may be committed by it in the administration thereof.

**Section 21.**   All employees on a job, except for apprentices and temporary employees, shall receive the full rate of pay for commercial journeymen roofers set forth in the wage exhibit(s) to this Agreement.   The Union will issue to each employee a card designating the employment category of such employee and the employee shall exhibit such card to the Employer upon reporting for work. Temporary employees hired in accordance with Article VI Section 16 and 18, and Article XXXVIII Section 6 shall receive a rate of pay equal to their demonstrated hours of experience in commercial roofing work in accordance with the hiring provisions of this Article.

**Section 22.**   A Union representative will be in attendance at the Union office every working day until 9:00 a.m.

**Section 23.**   The Union shall give an Employer advance notice no later than 11:00 a.m. on a particular day that the Union shall have qualified journeymen available for work on the following day.   The Union shall also, upon Employer's request, ask such journeymen if they intend to remain on the particular job as long as required of them by the Employer and so advise the Employer of each employee's response thereto.

**Section 24.**   Employees shall notify the Union Hall and their Employer (or its designated Representative) before their established start time if they are unable to report for work that day. When employees are absent replacements will be sent by the Union. In accordance with the Referral Procedure contained in this Article VI, when a replacement is to be sent by the Union, the Employer (designee) shall have the right to select a specific employee from among the available applicants on the "out-of-work list". In the absence of a selection by the Employer (designee), the Union will refer a replacement in accordance with the

9

Hiring Hall Procedures. In such instances, the Union will endeavor to refer a replacement with the same wage and benefit scale as the absent employee. Applicants referred by the Union as replacements who report to the job site and are not put to work by the Employer (designee) shall be entitled to two (2) hours pay (wage and benefits) for so reporting, unless prevented from working on the job by weather conditions or other conditions beyond the Employer's control. Replacements accepted for employment shall be paid only from the time they report to the job site.

**Section 25.**  The Union agrees that it will not pull journeymen employees from one Employer and transfer them to another without the Employer's consent.

**Section 26.**  No person represented by the Union shall work for any Employer failing to maintain adequate coverage under the Workers' Compensation Act and the Unemployment Insurance Act, or failing to make proper contributions and/or filing of reports to the existing Welfare Fund, Pension Fund, Union Fund, Vacation Fund, Credit Union, Annuity Fund, Political Action and Educational Fund, Roofers Home Association Fund, RCA Industry Fund, and Roofing Apprenticeship Fund, or otherwise failing to obtain any bonds or insurance required by this Agreement.

# ARTICLE VII
## Administration of Agreement by
## Joint Conference Board

**Section 1.**  For the purpose of administering this Agreement, adjusting disputes between the parties and/or co-parties hereto, and promoting the legitimate interests of the composition roofing, damp and waterproofing industry in general, the Association and the Union shall create and maintain a joint administration body to be known as the Joint Conference Board, consisting of three (3) members of the Association and three (3) members of the Union.

**Section 2.**  The Joint Conference Board shall meet upon call at the request of either party hereto, if and when necessary, for the purpose of considering matters requiring urgent action or of hearing and adjusting disputes as herein provided. The Joint Conference Board shall also function as the RCA/Roofers Local 30 Labor/Management Committee which shall meet every six weeks but not less than six times annually.

**Section 3.**  The powers of the Joint Conference Board in matters other than the adjustment of disputes as provided in Article VIII shall be subject to the established policies of the Association and the Union respecting ratification of the acts of their several agents.  All decisions of the Board shall require the concurrence of a majority of the representatives of each of the parties hereto.  In the case of a formal ballot, the representatives of each party shall have equal voting strength.

**Section 4.**  In the event either the Employer or the Union or any of its members shall violate any of the provisions of this collective bargaining agreement, then the party found to be guilty shall be directed by the Joint Conference Board to pay damages the Joint Conference Board deems appropriate.

# ARTICLE VIII
## Adjustment of Disputes

Any dispute or disagreement arising between parties or co-parties shall be resolved in accordance with the following grievance/arbitration procedures:

**Section 1.**  Definitions
(a)  "Employee" is any employee performing work for an Employer within the coverage of this Agreement, whether or not such employee is a member of the Union.
(b)  "Grievance" is any dispute between an employee and his Employer, or between the Union and an Employer or the Association.
(c)  "Grievant" is the employee filing a grievance.

10

(d) "Grieving Party" is the party (the Union, an Employer, or the Association) pursuing a grievance.
(e) "Days" unless otherwise noted, means calendar days.

**Section 2.** Procedure
(a) **Informal Step:** Whenever any employee has a grievance, he may discuss the grievance orally with a representative of the Employer. The employee may, if he so desires, also orally inform the steward, if there is one, of his grievance, in which case the steward shall discuss the grievance with a representative of the Employer. This informal step is not mandatory and failure of an employee to discuss his grievance orally with his Employer or steward shall not be grounds for denial of the grievance.

In the event an employee or steward discusses a grievance with an Employer's representative, the Employer's representative shall attempt to adjust the grievance. If the employee elects to have the steward discuss the grievance with the Employer's representative, the Employer shall not discuss the grievance directly with the employee unless the employee expressly requests that it do so.

(b) **Step One:** If the employee decides not to process a grievance through the Informal Step, or if the grievance is not resolved at the Informal Step, the employee shall inform the Union of his grievance in writing within ten (10) days of the date on which the conduct being grieved occurred. The employee may use the form described in Section 4 for this purpose, but it shall be sufficient if the employee writes his grievance in any manner. The written grievance submitted by the employee shall contain the date the grievance is submitted to the Union, the employee's name, the name of the Employer against which the grievance is being submitted, and the conduct which is the subject of the grievance.

The Union officer, business agent or representative who receives the grievance from the employee shall, within five (5) days of receipt of the grievance, note the date the grievance is received upon the face of the grievance, initial the grievance, and give or mail a copy of the dated and initialed grievance to the employee.

The Union, an Employer, or the Association may initiate its own grievance at this step, and shall follow the procedures set forth below.

Within fifteen (15) days of the date on which the conduct being grieved occurred, the Grieving Party shall submit the grievance in writing to the party whose conduct is being grieved... The Grieving Party shall submit the written grievance on a form which the Union shall produce consistent with the requirements set forth below in Section 4. The Union shall retain a copy of all written grievances and, when the grievance has been filed by an employee, shall give a copy to the grievant.

Within seven (7) days of the submission of the grievance to the party whose conduct is being grieved, that party shall respond to the grievance in the space provided on the grievance form and an attached sheet, if necessary. When the grievance has been filed by an employee, the Union shall within five (5) days of the response to the grievance, give or mail the grievant a copy of the Employer's response. If no response is submitted to the Grieving Party within this time, the grievance shall be deemed finally granted.

(c) **Step Two:** If the grievance is denied at Step One the Grieving Party may submit a grievance to the Joint Conference Board within ten (10) days of receipt of the denial response. If the grievance is not submitted to the Joint Conference Board within this time period, the grievance shall be deemed to be finally denied. Where the grievance was initiated by an employee, the Union shall inform the grievant in writing why the grievance was not submitted to the Joint Conference Board.

The Joint Conference Board shall meet monthly when there are grievances which have been submitted to be heard by the Joint Conference Board, and shall hear presentations by the Union and the Employers and the Association involved on all grievances which have been denied at the First Step of the grievance procedure during the monthly period preceding the meeting.

The Joint Conference Board shall consist of three (3) representatives of the Union and three (3) representatives of the Association. Two (2) of the Union representatives and two (2) of the Association representatives must concur for the Joint Conference Board to issue a decision. The Joint Conference Board shall issue its decision to each grievance within fifteen (15) business days of the presentation of the grievance to the Joint Conference Board. The decision issued by the Joint Conference Board shall be binding on the parties to the grievance.

11

(d) **Arbitration**. If the Joint Conference Board fails to resolve the grievance, a grievance relating to the interpretation or application of this Agreement may be submitted to arbitration.   Grievances not relating to the interpretation or application of this Agreement are not subject to arbitration.

The Grieving Party may submit the grievance to arbitration within fifteen (15) days of the Joint Conference Board's decision.   Arbitration shall be conducted under the auspices of, and in accordance with the rules of, the American Arbitration Association.

The cost of the arbitration will be shared equally by the parties to the grievance. The decision of the arbitrator shall be final and binding on the Employer or the Association and the Union.   If the Union does not submit an employee grievance to arbitration, the Union shall inform the grievant in writing of its reasons for not arbitrating the grievance.

### Section 3.  Records

The Union shall maintain records of all grievances filed under this Agreement, including copies of all grievances, all responses submitted by Employers, and all other correspondence and documents relating to grievances, including minutes of hearings, before the Joint Conference Board.   These records shall be maintained in separate files for each individual grievance and each grievance shall be assigned a separate file number.

### Section 4.  Forms

The Union shall produce a form for the submission of the grievances at Step One.   The form produced by the Union shall provide for the grievant's name, the grievant's Employer, the name of the Grieving Party, the date the alleged grievable conduct occurred, the date the grievance was filed with the Union (where applicable), and a description of the conduct being grieved.   The form shall also provide space for the response.   The form produced by the Union shall be agreed upon by the Association.

### Section 5.  Location of Grievance Meetings

No step in the grievance procedure, no meeting of the Joint Conference Board and no arbitration hearing shall take place on any property owned, occupied or controlled by the Union or any affiliated entity.

### Section 6.  No Strike Clause

Except as otherwise set forth below, the Union shall not engage in any strike or any work stoppage during the term of this Agreement and the Employer shall not engage in any lockout of employees covered by this Agreement. It is expressly recognized that the parties have set forth, in the provisions of this Agreement, exceptions to this provision that permit the Union to withhold the work of employees performing work for an Employer in the following circumstances:

(a)       This provision shall not apply in circumstances where the Union withdraws the services of its members with respect to an Employer that is delinquent in its contributions to any Union fringe benefit fund or the Union;

(b)       The Union and employees covered by this Agreement shall not be required to cross any primary picket line established by any bona fide labor organization, and/or the Union party to this Agreement shall have the right to withdraw employees covered by this Agreement whenever the Employer party to this Agreement is involved in a primary labor dispute with any bona fide labor organization.

(c)       The Union may, in accordance with this Agreement and past practice, pull workers from a job for picket line duty elsewhere.

## ARTICLE IX
## Hours of Work

**Section 1.**  Eight (8) consecutive hours, between 5:00 a.m. and 4:30 p.m., exclusive of one-half (½) hour for lunch at approximately 12:00 noon, shall constitute the basic working day.

**Section 2.**  Five (5) eight-hour days, excluding Saturday and Sunday, shall constitute the basic working week.

12

**Section 3.** New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day shall be observed as legal holidays; provided, however, that should any of such holidays fall on a Sunday, the following Monday shall be observed as a holiday.

(a) No work will be performed on the aforesaid holidays except in cases of emergency and with the permission of the Business Representative. Time and one-half shall be paid for all such work.

(b) Each Employer shall deduct from the wages of each employee other than an apprentice for an account in the Vacation Fund provided in this Agreement the amount of ten cents ($.10) per hour worked to be escrowed for and paid to each such employee. (This deduction shall be in addition to the $1.10 hourly deduction for the Vacation Fund). On Election Day in November employees shall be paid by the Vacation Fund the amount of their accumulated contribution at $0.10 per hour.

(c) A holiday will also be established in memory of John McCullough, former Business Manager of the Union, which shall be designated annually by the RCA and the Union. The sum of ten cents ($.10) per hour worked shall be deducted from the wages of each employee other than an apprentice and transmitted to the Vacation Fund provided in this Agreement, under which a separate account for this purpose shall be maintained.

**Section 4.** Any and all work performed within the basic working day and week shall be known as straight-time work. Any and all other work shall be known as overtime work, except as otherwise provided in Article X.

**Section 5.** There shall be no work on Saturdays, Sundays or any other of the holidays specified in Section 3 of this Article, except in case of a bona fide emergency, nor until the Business Representative of the Union has satisfied himself that the emergency is a bona fide one and has authorized the work to proceed. Except as specified in Article XVIII Section 2, such work shall be performed only by journeymen roofers unless otherwise approved by the Union's principal office.

**Section 6.** Employees shall be on the job, clothes changed, ready to work at the designated start time and shall continue working until fifteen minutes prior to the designated quit time, exclusive of one-half (½) hour for lunch. Employees shall secure and protect equipment and materials on the job and change clothing during the last fifteen minutes of the basic working day and shall not leave the roofing site prior to the end of the work day. Any employee not adhering to this rule may be penalized by a pay deduction or immediate dismissal for any time lost after the designated start time or prior to the end of the work day. No materials shall be used on a job during the last fifteen minutes of the work day.

**Section 7.** From May 1 to October 1 an early startup shall be permitted at the option of the employees in the crew, subject to the Employer's approval, which approval shall not be unreasonably withheld. This option shall not apply to the first day that a job starts.

**Section 8.** Employees shall also receive a holiday on the last working day before Christmas and shall receive four (4) hours pay (wage and fringe benefits) for such day.

## ARTICLE X
## Wage Rates

**Section 1.** Any and all commercial roofing and commercial reroofing work covered by this Agreement shall be performed by commercial journeymen roofers and commercial apprentices. Other classifications of workmen, except temporary employees as provided for in Article VI Section 16 and 18 and Article XXXVIII Section 6, are strictly prohibited. The minimum hourly wage rate for all commercial journeymen roofers and commercial roofer apprentices covered by this Agreement when employed to perform any work within the jurisdiction of this Agreement shall be set forth in Exhibit "A".

(a) The base rate for apprentices is calculated as a percentage of the journeyman's base rate. The appropriate percentage for each apprentice period shall be as set forth in Exhibit "A". (Refer to wage schedule for current rates).

13

(b)     The base rate for working foremen shall be Two Dollars ($2.00) per hour more than the journeyman's rate for a crew of five (5) men or less and Two Dollars and Fifty Cents ($2.50) more than the journeyman's rate for a crew of six (6) men or more.

(c)     The basic rate for moppers and operators of felt laying machines shall be Fifty Cents ($.50) per hour more than the journeyman's rate at all times.

(d)     A premium rate of Fifty Cents ($.50) per hour above the regular scale shall be paid to all journeymen and foremen (not apprentices) for roofing work (this requirement shall not apply to workmen performing duties other than the application of roofing materials) performed on any new construction job on those days on which a felt laying machine or slag dispenser machine is used regardless of whether the same are manually operated or motor driven. This requirement shall not be applicable on publicly funded new construction projects or on projects on which relief has been granted. This Section shall not permit the use of machinery which is otherwise prohibited in Article XII.

**Section 2**.   Overtime work shall be paid for at one and one-half times the basic rate of wages.

**Section 3.**   Overtime work performed before the designated start time of any working day included within the basic working week, by employees assigned to tend kettle shall be paid for at the rate of one and one-half times the basic rate of wages.   Any employee who is assigned to tend kettle and is called in early for purposes of light up shall be guaranteed at least one (1) hour of light up time at this premium rate.   The Employer shall have the privilege of requesting an employee to take an early lunch period so that he can tend kettle during the normal lunch period.

(a)   Should an employee be assigned to tend kettle during the normal lunch period and no arrangements are made for him to receive an early lunch, he shall be paid one and one-half times his basic rate of wages for the lunch period.   Both the foreman and the kettleman shall be jointly responsible for checking with one another to see if the kettle is to be operating during the normal lunch period and, if so, who shall be the kettleman's replacement.

**Section 4.**   Where an entire crew starts work before the designated start time, as in the case of spudoff, tear-off, or other special conditions as in Article IX , Section 7 (except extra shift work), the kettleman shall receive the same rate of pay as the rest of the crew for all time worked by him concurrently with the rest of the crew.

**Section 5**.   In the event that any employee is required to report to work prior to the designated start time or to remain after the designated quit time for the purpose of loading or unloading material, he shall be paid time and one-half for the hours worked.   Employees may be required to report at the Employer's yard or shop for orders.

**Section 6.**   All journeymen employees who are engaged as moppers for at least two (2) hours during the course of the working day shall receive an additional Fifty Cents ($.50) per hour for that day.

## ARTICLE XI
### Method of Wage Payment

**Section 1.**   Wages shall be paid weekly on the job at or before quitting time of the regular payday.

**Section 2.**   The Employer shall make payment of wages by check.   The workweek shall end at the designated quit time on Tuesday and all employees are to be paid for the week on Friday.   When weather on a Friday is inclement, employees shall be entitled to be paid at the office of their Employer not later than 11:00 a.m. on such day or wages for employees may be sent to, and received by, the Union no later than 2:00 p.m. of said day if the Employer's office is not located in the Union's jurisdiction.   In either case, however, the Employer must provide each employee with a retainable, itemized check stub which will include the employing company's name, the employee's Social Security number, date, and itemized hours worked by the employee.

14

**Section 3.** Employees discharged or laid off for any reason shall be paid in full by check at the time of discharge or layoff, if so demanded, and subject to the provisions of Section 5 of this Article. Any failure to pay employees in accordance with this Section shall result in the employees being entitled to be paid for any waiting time. This obligation shall not apply to replacements, which shall be paid at the end of the pay period.

**Section 4.** Employees quitting jobs of their own accord may be required to wait until the following regular payday for their pay, at the option of the Employer.

**Section 5.** Employees discharged for improper conduct on their own part may be required to go to the Employer's office or yard for their pay at the option of the Employer; the same to be ready for them, upon demand, within twenty-four (24) hours.

## ARTICLE XII
## Use of Materials & Machinery

**Section 1.** There shall be no restrictions against the use of any materials raw or manufactured, except prison-made materials, nor restrictions against the use of machinery or tools, whether motor driven or hand operated except as herein stated;

(a) All machinery and tools shall be operated in conformity with requirements set forth in Federal, State or local safety and health regulations, and in conformity with manufacturer's specifications and directives.

(b) There shall be no motorized machinery carrying hot on the roof.

(c) Whenever the hand operated felt laying machinery is used and regardless of the purpose for which it is being used, there shall be a hot carrier in attendance at all times. One employee shall be assigned to each hot buggy when in use. Notwithstanding anything herein to the contrary, the hot buggy operator may service more than one (1) location on a roof or more than one piece of equipment on a roof.

(d) Whenever the hand operated felt laying machine is being used for laying felt there shall be a separate three (3) employee crew, aside from the regular crew, consisting of the operator, the hot buggy operator and the employee to set the felt in attendance at all times. When the machine is not in use employees shall perform other duties required of them. If an entire crew does not report for work, and the Union is unable to supply replacements, then employees can be used in any capacity provided that the shop steward or the Union is notified within twenty-four (24) hours of the name of the employee who did not report and the job to which he failed to report. Further, when slag is being transferred from a truck to a conveyor by use of chute (that is, when no shoveling is required) only one (1) employee shall be required.

(e) Whenever power vacuum machine(s) are being used to remove slag from a roof there shall be a crew of one (1) journeymen roofer and one (1) apprentice roofer employed on each machine and they shall perform any work directed by the Employer which is related to the operation of the power vacuum. Under no circumstances shall the number of apprentices exceed the number of journeymen on any vacuum machine in use. When the machine is not in use, the roofers shall perform other duties required of them.

(f) Commercial journeymen roofers shall operate all machinery connected with loading, unloading, application, removal and cleanup of any and all roofing and waterproofing systems. This requirement shall not apply to any operation of a daily rented crane or boom truck.

(g) Whenever tankers with automatic temperature controls are being utilized, one commercial roofer shall be assigned as an on the ground attendant for a minimum of four (4) hours per day when the roofing crew is working. Whenever a roofing crew has not worked at the site where such a tanker is being utilized for two consecutive days or more, the assigned attendant shall be guaranteed one (1) hour of light-up time at time and one-half the basic rate of wages on the first day the roofing crew returns to work at that site.

**Section 2.** Roofers shall handle all roofing materials on the job, regardless of whether the same have been purchased by the roofing contractor or the general contractor. It shall be the responsibility of the roofers to move, load or unload on the job site all roofing materials and/or roofing equipment except for an occasional piece(s) of equipment delivered to, or received from, the job site before the job begins or after it ends. There shall be a minimum five (5) roofer crew on loading and unloading of all jobs, provided however, that the loading and unloading of small amounts of equipment and material on jobs where not more than one standard

15

sized truck of equipment and one standard sized truck of material are involved may be performed by a minimum three (3) roofer crew. No employees shall work under a hoist while working off a truck.

**Section 3.**   Rolls are not to exceed 4,000 square feet in area.

## ARTICLE XIII
## Use of Employees

**Section 1.**   The Employer shall have the right to place and use employees in any capacity he may see fit, including the selection of working foremen, provided:

(a)   That he shall adhere to the wage rates herein prescribed for the class of work in question.

(b)   There shall be no less than two (2) roofers on any roofing work, including spraying, performed in Philadelphia or in the territory under the jurisdiction of Local Union No. 30, except on repair work where only cold material is used and except spraying work where it can be effectively handled by one employee with other than motor operated air compressors.

**Section 2.**   A working foreman from Local 30 shall be required on all jobs.   He shall be selected by and be at all times the Employer's representative on the job and shall maintain discipline, carry out the orders of the Employer and see that all employees working under him do likewise.   He shall also have the authority to remove employees from the site who disobey his instructions.

**Section 3.**   There will be a kettleman in attendance of the kettle at all times, as long as hot material is being used or heated.

**Section 4.**   On any hot jobs where asphalt is pumped to the roof, a minimum five (5) man crew must be utilized.   The five (5) man crew shall consist of a kettleman, a roll man, a felt setter, a hot carrier and a mopper.

**Section 5.**   When, at the option of the Employer, two (2) employees are assigned to a single service truck, it shall be permissible for a crew of one (1) journeyman roofer to one (1) apprentice roofer to be used on the service truck. Under no circumstances shall the number of apprentices exceed the number of journeymen on a service truck.

## ARTICLE XIV
## Limitations on Work

**Section 1 .**   No limitations shall be placed upon the amount of work which any employee shall perform during the working day; nor shall any rules, customs or practices be permitted which limit production or unnecessarily increase the time to do the work.

## ARTICLE XV
## Reporting, Reporting Pay and
## Early Completion of Jobs

**Section 1.**   Employees referred for work shall be paid for all waiting time due to delays occasioned by the Employer.

**Section 2.**   Employees instructed by the Employer or his authorized agent to report on the job and not put to work the same day shall be allowed two (2) hours' time for so reporting, unless prevented from working by weather conditions or other conditions beyond the Employer's control.

**Section 3.**   Employees instructed by the Employer or his authorized agent to report at the Employer's yard or shop and not put to work the same day shall be allowed two (2) hours' time for so reporting, provided

16

that this shall not apply where the employees report voluntarily or as a matter of routine, or where the nature of the order or the circumstances under which it is given are such that it might reasonably be interpreted as subject to weather conditions.

**Section 4.** Any employee who fails to report for work without due and timely notice to his Employer or this Union shall be reported to Local Union No. 30. Employers must notify employees the day previous in the case of non-employment.

**Section 5.** Except as provided in Article VI Section 24 with respect to replacements, all employees who report for work and who finish the job prior to the normal quitting time and who are not transferred to another job on that day at the Employer's option shall be paid for eight (8) hours.

**Section 6.** An employee shall notify his Employer and the Union Hall before the designated start time if he is unable to report for work on that particular day. In cases of lost time or sickness, employees should notify the shop before returning to work so that a job will not be overmanned.

**Section 7.** Whenever a job is completed prior to the normal quitting time, employees shall not leave the job site before loading the trucks with materials and other equipment to be returned to the yard. In the event that there is no loading of trucks which is required, the employees shall nonetheless notify the Employer before leaving the job site prior to the normal quitting time.

**Section 8.** The Employers agree that all employees shall be advised prior to quitting time, when such notification is practical, of the job to which they are to report on the following day.

**Section 9.** On those job sites where there is a guard on the gate and the employees are required to sign in at the gate, it shall not be necessary for the employees to be on the roof itself at the start of the day, but it shall be sufficient and satisfactory if the employees are within the job site itself at the starting time and proceed to the roof as soon as possible.

**Section 10.** All employees reporting to the job shall be identified with ID cards as apprentices or journeymen prior to starting work.

**Section 11.** All jobs must be called off by reason of inclement weather on the job site.

## ARTICLE XVI
### Tools, Clothing, Safety
### and Personal Convenience

**Section 1.** Employees shall furnish their own hammer or hatchet, trowel, nail apron, felt knife, insulation knife, standard-length tape and scissors. All other tools and equipment shall be furnished by the Employer, including foul weather gear in inclement weather, rubber boots on waterproofing work when necessary, and provided that employees regularly employed as kettle tenders shall be permitted to carry such extra small tools as are essential to their particular work.

**Section 2.** The foreman shall report to the Employer and the steward to the Union, any accident which may occur on the job. This report must be in writing. Any employee injured on the job shall immediately report such injury to the foreman.

**Section 3.** The Employer agrees to provide disposable cups, first aid kits and sanitary water containers on all jobs, with the understanding that the employees on the job shall be responsible for their care and maintenance.

**Section 4.** A Safety Committee shall be established consisting of two (2) representatives on behalf of the Employers and two (2) Union representatives. The Safety Committee shall meet periodically to establish rules, regulations and recommendations for improving safety conditions on the job.

17

**Section 5.**   One employee on each job, other than the mop man, shall be permitted to get non-alcoholic refreshments for the employees on the job once a day, before lunch break. Upon delivery of such refreshments to the work crew, the employees shall be permitted a fifteen (15) minute work break in order to consume such refreshments.

**Section 6.**   All hazardous or man-sized openings on a roof shall be covered securely and safely before any Employer or employee covered by this Agreement begins work on a job.

**Section 7.**   Ladders, if unsafe, may be condemned by Union Business Agents and their use prohibited. Aluminum ladders will not be used on job sites under any circumstances.

**Section 8.**   Each Employer shall comply with all applicable federal, state and local safety laws or other applicable safety standards.

**Section 9.**   Local 30 safety regulations shall supersede those of any other local union when Local 30 members are used on a job site outside Local 30's geographic area.

**Section 10.**   In the event single-ply system roofing is used, the Employer must provide rubber gloves, respirators, goggles and such other safety and health devices as shall be appropriate.

**Section 11.**   In the event the Union determines that a job is unsafe, and the condition is not immediately remedied, the Union shall have the right to stop the job until the condition is cured.   After the first day, the failure of an Employer to comply with the requirements of Sections 6 and 7 shall result in payment of all lost wages and benefits as determined by the Local Union.

**Section 12.**   If an employee is seriously injured on the job, the foreman may assign an employee to take the injured worker to obtain medical treatment.

## ARTICLE XVII
### Layoffs

**Section 1.**   The Employer shall notify the Union Business Office as early as possible the day that employees are to be laid off to facilitate their re-employment.   Wages owed to employees, including pay for waiting time after the completion of eight (8) hours of work, must be paid at the time of the layoff, except for replacements that will be paid at the end of the pay period.

## ARTICLE XVIII
### Apprentice Ratios

**Section 1.**   Apprentices shall be employed on commercial new and re-roofing work at a ratio of three (3) journeymen to one (1) apprentice.

**Section 2.**   Beginning June 1st through and including October 31st, apprentices shall be permitted to work on Saturdays, Sundays and/or holidays with the crew to which they are regularly assigned. Except as specified above, no apprentice shall work on Saturday, Sunday or any holiday without the approval of the Business Representative.

**Section 3.**   On publicly funded non-residential new and reroofing projects, the Union agrees to permit the following apprentice ratios: one (1) apprentice shall be permitted to two (2) journeymen and two (2) apprentices to four (4) journeymen.   On such projects only, the apprentice to journeyman ratio shall continue as follows: three (3) apprentices to six (6) journeymen, four (4) apprentices to eight (8) journeymen, five (5) apprentices to ten (10) journeymen, six (6) apprentices to twelve (12) journeymen.

18

## ARTICLE XIX
### Apprentice

**Section 1.**   Apprentices shall be employed under the terms of the Roofers Local 30 Joint Apprenticeship Committee's "Apprenticeship Standards for Roofers" which are made a part of this Agreement as if reproduced herein.   Said Standards and the rules and regulations established by the Joint Apprenticeship Committee shall be binding upon the parties hereto.

**Section 2.**   There shall be a pool of first period apprentices available for hire at all times during the year, in accordance with the application procedure developed by the Local 30 Joint Apprenticeship Committee.

## ARTICLE XX
### Union Visitation

**Section 1.**   The Union shall not interfere with employees during working hours, except that the official Business Representative of the Union may consult with the steward or foreman on the job when necessary.

**Section 2.**   The Employer agrees to recognize and deal with such representatives of the Union in his shop at reasonable business hours.   The Employer further agrees to hereafter permit duly accredited representatives of the Union to visit the shop and offices at any reasonable time during working hours to inspect, for the purpose of auditing, the list of employees, payroll records and time cards in order to determine if the shop is being conducted in accordance with the terms of this Agreement; said right of inspection of records shall be effective only as of the commencement date of this Agreement.

**Section 3.**   The Union will make every reasonable effort, where practical, to avoid inconvenience to any Employer when pulling employees from the shop for picket duty.

## ARTICLE XXI
### Stewards

**Section 1.**   The Union shall have the right to appoint one steward at each shop.   The steward at each shop shall have super seniority (i.e., the last to be laid off and the first to be recalled).   No shop steward shall be laid off so long as the Employer retains more than one established foreman on active employment.

**Section 2.**   The Union agrees, from time to time, to supply the Association with a current list of all shop stewards.

**Section 3.**   The Union shall have the right to appoint an additional temporary steward in any shop where it deems such appointment necessary, but such shop steward shall not enjoy super seniority.

**Section 4.**   The second employee to be employed at each shop will be the shop steward.
**Section 5.**   The Union will hold monthly steward safety meetings and each Employer will permit the steward at its shop to attend such meetings. The steward shall be paid his regular rate of pay for such attendance, not to exceed four (4) hours pay.

## ARTICLE XXII
### Traveling Time/Traveling Expense

**Section 1.**   Subject to the reporting pay provisions of Article XV, employees referred for work on the same day will be paid from the time they report for work on the job, plus the daily travel expense allowance for jobs that are 75 miles or less from the Employer's shop.

19

**Section 2.**   If an employee quits after working an hour or two due to a personal reason, he shall not be paid traveling for a full day.   He shall be paid for one-half of a full day's traveling time, except when he is fired.

**ARTICLE XXIII**
**Out-Of-Town Work**

**Section 1.**   The parties to this Agreement recognize that the nature of the working conditions in the roofing industry are such that journeymen are frequently unable to work sufficient hours within the jurisdiction of Local 30 as covered by this contract to enable them to retain eligibility for health and welfare coverage and accrue pension credit.   As a result of this situation, the Employers hereby agree that when performing work outside of the jurisdiction of Local 30 of this contract, fifty-percent (50%) of each Employer's journeymen shall nonetheless be comprised of journeymen who normally and regularly work for the said Employer or other Employers party to this contract within the jurisdiction of Local 30 and this Agreement.   The Employer shall, in such circumstances, continue to pay contributions to the Health and Welfare Fund, Annuity Fund, Pension Fund and all other applicable Funds and make deductions for the Vacation Fund (including the Credit Union) and the Union Fund in accordance with Article XXVII and Article XXX.   The remainder of the Employer's work force in such situations when working beyond the jurisdiction of Local 30 and this Agreement may be composed of employees who normally and regularly work for Employers having collective bargaining agreements with the local roofers union within whose jurisdiction the work is being performed.   The work rules of the local union in whose jurisdiction jobs outside the coverage of this agreement are located, however, shall be used on such jobs.

The provisions of the foregoing Section shall not apply where:
(a) Sufficient qualified employees are not available within the jurisdiction of Local 30, or
(b) Where the Employers are required to pay Health & Welfare Fund and Pension Fund contributions and make the deductions for the Vacation Fund (including the Credit Union) for Local 30 employees to the local union having jurisdiction in that area where the work is being performed.

If an Employer that is signatory to a collective bargaining agreement with another local roofers union performs work within the jurisdiction of Roofers Local 30 and this Agreement with employees who are from the Employer's home Local and pays those employees the higher of the two wage rates and pays all contributions owed for those employees into its Home Local's funds and the total wage and fringe benefit paid is below the rate specified under this Agreement, fifty percent (50%) of the difference between the two rates shall be paid to the Local 30 Combined Pension and the other fifty percent (50%) shall be paid to the Local 30 Combined Health & Welfare Fund.

**Section 2.**   All jobs more than 75 miles from the Employer's shop shall be deemed Board Jobs. Board shall be paid at the rate of $35.00 per day when the employee is available for work on the job and, if the job extends over a weekend, the Employer is to pay the employee's Board for Saturday and Sunday. On such jobs all necessary transportation and travel expenses shall be paid to the job at the start and, for the return trip, at the completion of the job. Transportation and travel expenses created by extra trips to and from such jobs, when ordered by the Employer, shall be paid by the Employer when incurred. Employees working on Board Jobs shall not be entitled to the daily travel expense allowance called for in Section 4 of this Article.

**Section 3.**   All travel time during the regular working day and the regular working week (prescribed in Article IX, Sections 1 and 2) shall be paid for at the employee's regular rate of wages.

**Section 4.**   On all jobs seventy-five (75) miles or less from the Employer's shop at which the employee is employed, employees shall receive a daily travel expense allowance for ordinary and necessary expenses incurred, or reasonably expected to be incurred, in the business of the Employer. On all such jobs employees shall be paid, in addition to wages, an allowance of $8.00 per day for travel expenses for each day employed.

20

**Section 5.** Employers must notify Local Union No. 30 before sending employees out of the jurisdiction of this Agreement.

**Section 6.** No time shall be lost on Board Jobs aside from that lost by weather conditions, or unavoidable accidents which prevent the carrying on of the work.

**Section 7.** All employees shall be required to contact the Employer prior to leaving for the job in the event of questionable weather. No work shall be permitted on any job in inclement weather in the absence of the foreman without the employees first contacting the Employer at a designated telephone number to be supplied by the Employer.

**ARTICLE XXIV**
**Job Incurred Injuries**

**Section 1.** An employee hurt on the job shall be paid his full wages for the remainder of the day, provided that his injury requires hospital treatment and he is unable to return to work on the same day because of such injury. The foreman shall report to the Employer and the steward to the Union any accident which may occur on the job. Any employee injured on the job shall immediately report such injury to the foreman.

**Section 2.** Every employee injured on the job that requires hospitalization shall be guaranteed a semi-private room and duly qualified physician at the Employer's expense, provided that the same is available in the hospital.

**Section 3.** Each Employer who is not a part of the collective bargaining group or does not have a principal place of business located within the jurisdiction of the Local Union party hereto shall guarantee proper payment to all employees of such sums of money to which they may be entitled under the applicable Workers Compensation Statute and such Employers do further guarantee that such payments will be made as soon as they become due and owing.

**Section 4.** Each Employer shall pay Workers' Compensation to an injured employee if he has not received his check from the insurance carrier involved within two (2) weeks from the date of his injury. The account of the employee in the Vacation Fund established under Article XXVII of this Agreement shall guarantee reimbursement to the Employer of any sums so advanced. Once such checks are sent to the employee, they will be assigned to his Employer until the amount such Employer has advanced has been reimbursed in full.

(a) Where an injury is questioned as to coverage for Workers' Compensation, the obligation hereunder shall not apply.

(b) The Employer shall provide the Union with a copy of any and all insurance claim forms within forty-eight (48) hours of the accident or injury.

**ARTICLE XXV**
**Welfare Fund**

Contributions under the wage exhibit(s) to this Agreement shall be made to the Roofers Local 30 Health and Welfare Fund. Said contributions shall be used exclusively to provide health and welfare benefits (exclusive of unemployment compensation benefits) to eligible employees and their families in such form and amount as the Trustees of the Welfare Fund may determine in conformity with the existing Agreement and Declaration of Trust.

A copy of the existing Agreement and Declaration of Trust, together with amendments thereto, shall be attached to the original of this Agreement and shall then be considered a part of this Agreement as if set forth herein at length. The payment by the Employers to the Welfare Fund shall be made monthly on or before a date and in a manner and form that shall be prescribed by the Trustees requiring such information as is required therein.

21

By its signature to this Agreement, the Employer agrees to adopt and be bound by the existing Agreement and Declaration of Trust, together with amendments thereto, establishing the Welfare Fund.

## ARTICLE XXVI
### Pension Fund

Contributions shall be made under the wage exhibit(s) to this Agreement to the Roofers Local 30 Pension Fund. Said contributions shall be used exclusively to provide pensions for eligible employees in such form and amount as the Trustees of the Pension Fund may determine in conformity with the existing Agreement and Declaration of Trust.

A copy of said Agreement and Declaration of Trust, together with amendments thereto, shall be attached to the original of this Agreement and shall then be considered a part of this Agreement as if set forth herein at length.   The payment by the Employers to the Pension Fund shall be made monthly on or before a date and in a manner and form that shall be prescribed by the Trustees requiring such information as is required therein.

By its signature to this Agreement, the Employer agrees to adopt and be bound by the existing Agreement and Declaration of Trust, together with amendments thereto, establishing the Pension Fund.

## ARTICLE XXVII
### Vacation Fund

Pursuant to the established Vacation Fund, all Employers will deduct the amounts set forth in the wage exhibit(s) to this Agreement for each hour worked or paid for from the wages of each employee and submit the same to the Administrator of the Vacation Fund, along with the appropriate reporting forms and pursuant to such other rules and regulations as may be issued by the Trustees of the Vacation Fund. In addition, all Employers shall deduct amounts designated by the Union and/or employee for the Credit Union, and such amounts shall be transmitted to the Administrator of the Vacation Fund, along with Vacation Fund contributions. The Administrator of the Vacation Fund shall be responsible for transmitting Credit Union amounts to the proper entity.

The Agreement and Declaration of Trust are incorporated herein by reference and shall be binding on all parties hereto.

No more than ten percent (10%) of the journeymen roofers in any shop shall be permitted to take their vacation at the same time.

Apprentices shall not be subject to contributions to this Fund for hours worked.

By its signature to this Agreement, the Employer agrees to adopt and be bound by the existing Agreement and Declaration of Trust, together with amendments thereto, establishing the Vacation Fund.

## ARTICLE XXVIII
### Annuity Fund

**Section 1.**   There shall be established a Roofers Local 30 Annuity Fund to be jointly administered by Trustees appointed by the parties for the exclusive purpose of providing exclusive annuities for the eligible employees in such form and amount as the Trustees may determine in conformity with the Agreement and Declaration of T rust to be created by the parties.    Contributions shall be made under the wage exhibits to this Agreement to the Roofers Local 30 Annuity Fund.

A copy of said Agreement and Declaration of Trust, together with amendments thereto, if any, shall be attached to the original of this Agreement as if set forth herein at length.    The payment by the Employers to the Annuity

22

Fund shall be made monthly on or before a date and in a manner and form that shall be prescribed by the Trustees requiring such information as requested therein.

By its signature to this Agreement, the Employer agrees to adopt and be bound by the existing Agreement and Declaration of Trust, together with amendments thereto, establishing the Annuity Fund.

## ARTICLE XXIX
### Industry Fund

**Section 1.**  Each Employer party to this Agreement through the Association or as a co-party shall contribute the sum stated in wage exhibit(s) of this Agreement to the Industry Fund for each hour worked or paid for as such. Said contribution to be paid to the Industry Fund as aforesaid shall be included by each Employer when making remittances to the existing Welfare Fund and Pension Fund to such depository as may be mutually agreed upon from time to time, which depository shall forward said contribution made to the Industry Fund directly to its office at the end of each month, together with a statement setting forth the amount paid by each Employer and the number of hours for which payment was so made.   The rate of contribution to the Industry Fund may be increased at any time during the term of the within collective bargaining agreement or any renewal thereof upon notice to the Union.

**Section 2.**  No part of said Industry Fund and no part of the contributions shall be used for advertising, propaganda or other anti-union activities opposed to the interest of this Union.

**Section 3.**  It is expressly understood and agreed that said sum, payable as aforesaid to said Industry Fund, is not intended to be, and is not a contribution to, the employees and no employee nor Employer shall have any proprietary interest in said Industry Fund.

**Section 4.**  The Industry Fund shall promote programs of industry, education, training, research and promotion serving to expand the market for the services of the Roofing Industry and improve the technical and business skills of Employers, stabilize and improve the training and employment opportunities for employees, and undertake other appropriate activity in support of the Roofing Industry.

## ARTICLE XXX
### Union Fund
### (Dues Checkoff)

**Section 1.**  Upon receipt of written authorization from a journeyman and/or apprentice, the Employer shall deduct from the weekly wages of such journeyman and apprentice his field dues.

(a)  Deductions shall be made on account of field dues or service charges equivalent thereto, out of the first paycheck of each week after receipt of written authorization so to do and weekly thereafter from the first paycheck of the journeyman or apprentice, as the case may be, in each week during the period provided for in said authorization.

(b)  Deductions shall be made on account of field dues or service charges equivalent thereto on each and every paycheck subsequent to the receipt by the Employer of the written authorization.

(c)  Deductions provided for in the preceding paragraphs shall be made payable to the Union and remitted to the depository no later than the 15th day of the following month in which the deduction was made and shall include all deductions made in that month.

(d)  The Employer shall also furnish the Financial Secretary of the Union, monthly, with a duplicate copy of the record of those for whom deductions have been made and the amounts of the deductions.

(e)  Deductions to be remitted to the Union "Roofers Home Association" are, in fact, dues and should be so treated, although they may be remitted in a separate category on the reporting form.

## ARTICLE XXXI
### Roofing Apprenticeship Fund

Each Employer shall contribute to the Joint Roofing Apprenticeship Fund the sum stated in the wage exhibit(s) to this Agreement for each employee covered by the terms of this Agreement for the purpose of providing apprenticeship benefits and defraying the reasonable expenses and benefits of the Joint Apprenticeship Program of the parties.   Such contributions shall be subject to deductibility by all Employers for income tax purposes and may be increased from time to time when determined by the Trustees of the Joint Apprenticeship Program as being necessary and proper to defray such benefits and expenses.

The apprentices shall be employed under the terms and conditions prescribed by the Joint Apprenticeship Program and the Apprenticeship Standards for Roofers as approved by the Commonwealth of Pennsylvania and the United States Department of Labor.

A copy of the existing Agreement and Declaration of Trust and Apprenticeship Standards for Roofers, together with any amendments thereto, shall be attached to the original of this Agreement and shall be considered a part of this Agreement as if set forth herein.   The payment by the Employers to the Joint Apprenticeship Program Fund provided herein shall be made monthly on or before such date and in such manner and form as shall be prescribed by the Trustees and shall be accompanied by such information as they may require for the administration of the program.

**Section 1.**  In addition to the Roofers Local 30 Joint Roofing Apprenticeship Fund there has been established by the International Union, a Trust Fund known as the Roofers and Waterproofers Research and Education Joint Trust Fund. The parties and co-parties agree to designate the sum of Three Cents ($0.03) of the Joint Roofing Apprenticeship Fund's hourly contribution amount for each hour worked by bargaining unit employees under this Agreement on or after May 1, 2014 for remittance to the International Roofers Research and Education Joint Trust Fund.

## ARTICLE XXXII
### Political Action and Educational Fund

During the term of this Agreement, each Employer who receives from an employee in writing a voluntary, revocable authorization therefor, shall check off and deduct from the wages of such employee the sum stated in the wage exhibit(s) to this Agreement and transmit the same monthly to the Roofers Local 30 Political Education Fund.   Such Fund shall at all times be constituted as a segregated Fund and be otherwise organized and administered in such manner as to comply with applicable federal law governing the said activities and disbursement of such funds.

## ARTICLE XXXIII
### Payment of Contributions and
### Filing of Reports

**Section 1.**  Failure to comply with the provisions and requirements of this Agreement relating to the payment of contributions to the Welfare Fund, Pension Fund, Vacation Fund (including Credit Union), Annuity Fund, Industry Fund, Apprenticeship Fund, Roofers Home Association Fund, Political Education Fund, and/or failure to file the required periodic reports as provided for in this Agreement shall be considered as and constitute a violation of this Agreement.

**Section 2.**  Because of the serious consequences which may result from a failure to make such contributions to said Funds within the prescribed time limits, the following rules are hereby agreed to.   These rules shall be binding upon the Employer and enforceable by either the Fund involved or by the Union or both:

(a)      Reports and the contributions shall be made for each calendar month on or before the fifteenth of the following month, and shall be forwarded to the depository as may from time to time be mutually designated.

(b)      Should the Trustees of the Fund and/or the Union institute suit in a court of law to enforce compliance with the provisions and requirements of this Agreement related to payment of contributions and/or the filing of the required reports to the Funds, the Employer agrees to pay all costs, including reasonable attorneys' fees.   An Employer who has not paid its required contributions for a month by the 25th day of the month following the month in which the contribution obligation was incurred shall be required to pay, in addition to the unpaid contributions, interest equal to one percent (1%) of the gross amount of the contributions due the Fund for each month (or part of month) the contributions remain unpaid.   The Employer who is delinquent in such fashion shall pay counsel fees and liquidated damages up to fifteen percent (15%) of the amount of delinquent contributions to the various benefit funds in the event such funds find it necessary to initiate legal action to recover the delinquency.

(c)      Anything in this Agreement to the contrary notwithstanding, including but not limited to the provisions in Article VIII, Section 6, the Union may, at its discretion, withdraw employees from the employment of the Employer if he fails to meet or comply with any or all of the provisions and requirements of this Agreement related to the payment of such contribution and/or the filing of the periodic reports required in connection therewith and the Union shall not be considered in violation of this Agreement if it does so and this Agreement shall not be considered as rescinded or abrogated because of such action.   Should the Union withdraw employees for this reason, the Employer agrees to pay each and every employee withdrawn for this reason full wages and expenses for each hour of wages lost until all contributions due have been paid and the appropriate reports filed.   The Employer's liability in this regard shall not exceed forty (40) hours of wages per employee in addition to the required contributions due and payable.   The Union agrees that it shall not withdraw employees in such cases unless payments of contributions and/or filing of the required periodic reports remain delinquent after the twenty-fifth (25th) of the month following the month for which they are due and five (5) days' notice by certified mail of intention to so act has been given the Employer.   Notwithstanding any provisions of this Agreement to the contrary, once an Employer is sixty (60) days delinquent in the payment of contributions and/or reporting of its contribution obligation to any jointly administered Fund hereunder (hereinafter "Delinquency"), the Union shall withdraw its members from employment on all jobs of such Employer in accordance with the procedure set forth below; provided that the Union shall not be required to do so where such action is prohibited by an applicable Project Labor Agreement, a National Agreement, or other similar agreements (hereinafter "PLA Projects").

### Procedure for Withdrawal of Members

1.      On the 55th calendar day after an Employer's Delinquency first occurs, the Union shall provide the delinquent Employer with written notice by certified mail, with copies to the Roofing Contractors Association and the Local 30 Funds Administrator, of its intention to withdraw its members from the delinquent Employer. However, the Union's failure to provide such notice shall not relieve the Union of its obligation to withdraw its members from the delinquent Employer under this section.

2.  On the 65th calendar day after an Employer's Delinquency first occurs, the Union shall withdraw its members from employment on all jobs of such Employer except PLA Projects and thereafter shall not allow any of its members to perform work on any of the delinquent Employer's non-PLA Projects unless and until the Employer either completely cures its Delinquency or the Board of Trustees executes a Settlement Agreement with the delinquent Employer that resolves all of the Employer's delinquent reporting and contribution obligations.

3.  If the Union fails to withdraw its members by the end of the 65th day after an Employer's Delinquency first occurs, the Roofing Contractors Association may file a demand for arbitration under the Expedited Labor Arbitration rules of the American Arbitration Association protesting the Union's failure to comply with this section. Notice of the Demand shall be provided to the Union by written or electronic transmission, which notice shall specify the name of the delinquent Employer and the date the delinquency commenced. The Arbitrator shall have authority to order the Union to immediately

comply with the obligation to withdraw its members as set forth in paragraph 2. If the Union fails to comply with an appropriate Order issued by the Arbitrator, the Arbitrator shall have the authority to order the Union to make the Funds whole for any unpaid contributions, plus interest owed to the Funds and not collected from the Employer that arose out of covered work performed by the delinquent Employer from the date of the Arbitrator's Order requiring that the Union withdraw its members through the date the Union complies with the Order.

4.    The time frames and obligations set forth above shall apply only after the Union has received written notice from the Fund Administrator stating that an employer delinquency concerning a failure to report or submit monthly contributions to the jointly administered Funds has occurred and providing a specific date when the "employer's delinquency first occurred." These time frames and obligations shall not apply in circumstances when a potential "delinquency" has resulted from a Fund audit until after the Funds have secured a judgment relating to such audit amount against the delinquent employer (in such event, the date of final judgment shall be construed as the date when the "employer's delinquency first occurred").

The Employer shall be liable for wages lost and expenses of employees as a result of such withdrawal (not to exceed forty (40) hours of wages per employee in addition to the required contributions due and payable).

(d)    Every Employer who employs members of Local Union No. 30 shall be obligated to place in escrow with the depository of the Funds a bond issued by a carrier acceptable to the Trustees thereof in an amount to be determined in accordance with the schedule set forth below.    This escrow shall be for the purpose of guaranteeing proper payment of all contributions to the Welfare Fund, Pension Fund, Vacation Fund (including Credit Union), Annuity Fund, Industry Fund, Union Fund, Apprenticeship Fund, Roofers Home Association Fund, Political Action and Education Fund and assuring the filing of all reports required in connection therewith.    Copies of all bonds so required shall be forwarded to the Association promptly after filing with the Funds.

| Hours Reported in Prior Year | Amount of Bond |
|---|---|
| 1 – 5,000 | $    20,000 |
| 5,001 – 10,000 | 35,000 |
| 10,001 – 15,000 | 55,000 |
| 15,001 – 25,000 | 90,000 |
| 25,001 – 35,000 | 125,000 |
| 35,001 – 45,000 | 160,000 |
| 45,001 – 55,000 | 195,000 |
| 55,001 – 65,000 | 230,000 |
| 65,001 – 75,000 | 265,000 |
| 75,001 – 85,000 | 300,000 |
| 85,001 – 95,000 | 335,000 |
| 95,001 – 105,000 | 370,000 |
| 105,001 – 115,000 | 405,000 |
| 115,001 – 125,000 | 440,000 |
| 125,001 – 150,000 | 525,000 |
| 150,001 and over | 550,000 |

The proceeds of each bond shall be payable proportionately to the individual Funds set forth above. The parties agree that the Boards of Trustees for the respective fringe benefit funds identified in this Agreement shall have, and are hereby granted, the power and authority to increase the amounts of the bonding requirements set forth above or to otherwise adjust the foregoing schedule dependent on the needs or requirements of each respective Fund.    The respective Boards of Trustees shall be, and hereby are, empowered to permit alternate means of security for the respective fringe benefit funds in the event a signatory Employer cannot obtain a bond from a reputable carrier.    The alternate means of security shall require the Employer to

26

post a cash bond in the amount equal to 40 hours of Local 30 journeyman wages, fringe benefits, check-off amounts (dues) and Apprentice Fund and RCA Industry Fund in effect as of May 1 of each year for each roofer employed and to pay all fringe benefit and check-off amounts on a weekly basis. Employers whose principal office or place of business is outside the area covered by this Agreement must open a bank account at a local bank within a radius of fifteen (15) miles of the job site at which the Employer is performing work and, in lieu of posting a bond, may:

   (1) Deposit a certified check in an amount equal to one (1) week's wages and four (4) weeks' anticipated benefit funds contributions for each roofer employed;

   (2) Make reports and payments to all Funds on a weekly basis in a manner prescribed by the Union. Upon completion of the particular job, the deposit will be returned less any amounts that are owed to the Funds.

   Any determination by the Trustees on the bond may be appealed to the Joint Conference Board. If the Joint Conference Board shall be unable to resolve the matter, such determination may be submitted to arbitration for final decision in accordance with the provisions of Article VIII of this Agreement.

   (e) Certificates of insurance evidencing adequate Workers' and Unemployment Compensation insurance shall be deposited with the Union and the foregoing Employer's Association before employees are furnished to any Contractor.

   (f) Each Employer designates the existing Employer Trustees of all Funds and their successors to act on its behalf, and agrees to be bound by all Resolutions, actions and decisions of said Trustees.

   (g) Each Employer shall permit the Trustees of the various benefit funds to conduct a payroll audit of its books and records in order to determine that appropriate contributions have been made for all hours worked by journeymen and apprentices.

**Section 3.**

   (a) Participation in the various Roofers Local 30 Benefit Funds by Owners of the Employer, or any other person employed by the Employer who does not perform work covered by this Agreement, shall be governed solely by the rules adopted by the Trustees of the Funds. For purposes of this Section 3, the term "Owner" means stockholder, officer, director, sole proprietor, partner, principal, trustee or beneficiary or other person with an ownership interest or powers similar to the officers or directors of a corporation in an incorporated or unincorporated business.

   (b) With respect to an Employee who is a Relative of the Owner of the Employer, the Employer shall be required to remit contributions to all Funds based on forty (40) hours per week or the actual hours worked, whichever is greater. For the purposes of this Section 3, the term "Relative" means and include the spouse and children of the Owner.

**Section 4.** The parties agree that, with respect to all Union dues checkoff amounts, including dues assessments, initiation fees and all other amounts withheld from wages that are payable to the Union, as well as Vacation Fund and Credit Union contributions, PAC Fund contributions and any other amounts that, in accordance with this Agreement, an Employer withholds from the after-tax wages of employees for submission to the Union and/or the Fund identified herein, such amounts shall not, under any circumstances, be construed as the property of the Employer or co-mingled with the Employer's assets. All such amounts, having been withheld from employee's wages, are hereby impressed with a "Trust" and shall be held by the Employer only pending timely transmission of such amounts to the Union and/or Fund, as the case may be. An Employer who has withheld or deducted such amounts under any provision set forth in this Agreement is prohibited from using such amounts for its own purposes or for the benefit of any other person.

**ARTICLE XXXIV**
**Adjustment - Hours of Work**

   This Agreement shall be subject to reopening for the adjustment of hours of work at any time during the life hereof, under any of the following conditions:

27

(a)    Provided that legislation is enacted limiting the working day to less than eight (8) hours, or the working week to less than forty (40) hours.

(b)    Provided a working day of less than eight (8) hours or a working week of less than forty (40) hours is put into effect by a majority of the Unions affiliated with the Philadelphia Building Trades Council.

## ARTICLE XXXV
### Finality

**Section 1.**   No Employer shall be solicited nor compelled by the Union to pay a higher rate of wages and benefits than is prescribed herein for the work in question.

**Section 2.**   The Union agrees that no new added rules or regulations shall be passed on to the Association or co-parties during the life of this Agreement.

**Section 3.**   The Agreement signed by this Association and the Union is final and the Union shall not enter into any special agreements.   Any side agreements (side letters) entered into at any time prior to the effective date of this Agreement are hereby terminated, unless attached as Appendices to this Agreement.

**Section 4.**   If any Section of this Agreement is found to be in violation of any federal or state law, that particular Section of the Agreement is hereby declared null and void.

## ARTICLE XXXVI
### City Wage Tax

**Section 1.**   Each Employer shall deduct the City of Philadelphia, Pennsylvania wage tax, where applicable, from an employee's earnings and forward the amount deducted to such City for each affected employee.

## ARTICLE XXXVII
### Miscellaneous

**Section 1.**   Each Employer shall provide the Union monthly with a list of jobs currently awarded to it.

**Section 2.**   The parties recognize that in situations where an Employer having obligations under this or related Agreements has violated the hiring or employment requirements thereof, damages are suffered by employees represented by the Union which are contractual in nature.   In such event, the Union shall make demand of such Employer for payment of liquidated damages in an amount approximating the value of the violation and, if agreed upon, payment thereof shall be allocated on a prorata basis to the appropriate fringe benefit funds, the Industry Fund and the Union.   Where appropriate, additional damages for deterrent purposes may also be assessed up to a maximum of fifty percent (50%) of the amount due and shall be allocated as described herein.

(a)   Any dispute concerning the amount to be paid as damages may be appealed to the Joint Conference Board and, if the Board is unable to resolve the matter, such dispute may be submitted to arbitration for a final decision in accordance with the provisions of Article VIII of this Agreement.   If litigation by the Union is required to enforce an award by the Joint Conference Board and/or an arbitrator under this provision, the Employer shall be responsible for payment of all court costs, including reasonable attorneys' fees.

(b)   The parties agree that the penalties and provisions set forth herein shall apply, inter alia, to violations of the provisions set forth in Article II, Section 5.

**Section 3.**   The Association shall promptly make arrangements to have its representatives, accompanied by representatives of the Union, hand deliver to all appropriate governmental agencies, and to

28

receive receipt thereof, all necessary data concerning the prevailing rates which should be required on all federal, state and municipal jobs in any locale.

**Section 4.**   Local 30 numbered stickers shall be placed on all trucks, large equipment or where practicable. The Union shall have the right to remove and secure stickers supplied to each Employer.

**Section 5.**   Any member of a Union, other than Local 30, affiliated with the International who is employed by a signatory contractor within the jurisdiction of Local 30 is responsible for paying two dollars ($2.00) per day dues to Local 30 in accordance with the International Constitution and Bylaws.   Such amounts shall be deducted from the employee's wages and shall be remitted by the Employer to Local 30 along with monthly remittance reports.

**Section 6.**   The parties recognize that its present employees are duly qualified journeymen and apprentices and in all circumstances where an Employer seeks to use or apply a new or specific product (or roof application) or where its employees are not experienced in the application of a specific product, it should be the Employer's obligation to train the employees in the use and/or application of the product.

## ARTICLE XXXVIII
### Relief Procedures

The parties agree to adhere to the following procedures when requesting and responding to requests for relief on specific job sites. When an Employer believes that relief in the form described below is necessary to enable the Employer to successfully compete against non-union bidders, the following procedure must be followed if relief is to be granted by the Union so that such relief, if granted, will be made available uniformly to any Employer who intends to bid on the relief project.

**Section 1.**   An Employer who believes that relief is needed on a project covered by the collective bargaining agreement shall advise the Union of its need for relief, in writing, no later than four (4) working days prior to the due date for the receipt of bids on such job.   The Union shall provide a copy of the request to the Industry Fund office on the same day that the request is received by the Union.   If no copy of the request for relief is received by the Industry Fund office on any given job, that job shall be considered to be governed by the remaining Articles of this Agreement and these relief procedures shall not apply.

**Section 2.**   The Union shall respond in writing to the Employer's request for relief within three (3) working days of the receipt of such request, unless the Union can respond sooner.   The Union shall supply a copy of the relief request response to the Industry Fund office on the same day that such response is received by the requesting Employer.

**Section 3.**   The Union will centralize its consideration of requests for relief in a single person headquartered at the Union's principal office.   Only an Employer signatory to the contract or an assent form shall be eligible for relief. Any request for relief not made in accordance with the terms of this procedure will not be considered valid or operative and will not be considered by the Union.

**Section 4.**   The Union will consider the request for relief based upon all the circumstances prevailing in regard to such job.   It will consider the geographic area, the nature of other business, the nature of the job and other relevant considerations.   The Union shall have sole discretion to deny a request for a grant of relief or to determine the kind or nature of relief, if relief is to be granted.   The decision of the Union shall be final and binding and shall not be subject to any appeal, grievance or other remedy.   Any grant of relief shall apply uniformly to all signatory Employers requesting relief or bidding on the job.

**Section 5.**   The request for relief submitted by the Employer shall identify the specific relief requested.   If relief is granted, the Union will provide relief in the form of a 1:1 ratio of journeymen to first and/or second period apprentices.   If requested to do so, the Union will also consider relief in the form of apprentice to journeyman ratios greater than 1:1 and/or work crews made up of a specific mix of journeymen

29

and apprentices from various periods. In addition to ratios, the Union will also consider relief in the form of the use of motorized "ride-on" equipment on the roof and in the form of a partial or full fringe benefit waiver or reduction. Where an Employer would be required by contract to establish a night shift differential, the Employer shall submit a request for relief to the Union requesting that it allow the Employer to pay its employees working said night shift at a reduced wage shift differential percentage.

Relief in the form of a partial or full fringe benefit waiver shall be available only in the counties of Adams, Bradford, Centre, Clinton, Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lackawanna, Lancaster, Luzerne, Montour, Mifflin, Northumberland, Perry, Pike, Snyder, Sullivan, Tioga, Union, Wayne, Wyoming and York in Pennsylvania and the cities of Baltimore, Maryland and Washington, DC and their environs. The Union shall make the unilateral determination of the extent and scope of the relief granted.

**Section 6.**   If the Union, after granting an Employer's request for relief, is unable to supply sufficient numbers of first and/or second period apprentices within forty-eight (48) hours of an Employer's written request for such personnel, the Employer shall be permitted to obtain such personnel from any source.   The Employer hereby agrees that all personnel obtained from sources other than the Union shall register with the Union as a temporary employee before reporting to the job site.   The parties hereby agree that all such personnel shall be employed by the Employer referring them only for the duration of the project for which the relief was granted.

**Section 7.**   The parties agree that, in instances where relief has been granted, it may be necessary for the Union to rotate first and second period apprentices to assure job manning.

**Section 8.**   The parties agree that layoffs on any job site or project where relief has been granted shall be accomplished in such a manner as to maintain the approved apprentice relief ratio, except that the steward and foreman shall be the last persons to be laid off from the job.

**Section 9.**   On any relief project, the Industry Fund contribution rate for hours worked shall be twenty cents ($.20) per hour.

**Section 10.**   As set forth in the preceding provisions of this Article, if the Union decides to grant relief on a specific job site or project, the Union shall issue, in writing, a letter granting relief concerning the specific job site or project.   In such circumstances, the letter shall be signed by the Union Business Manager. Unless such relief is granted by the Business Manager, in writing, all work on the project or job site shall be performed in accordance with the remaining provisions in this labor contract, and the relief procedures set forth in this Article shall not apply. No Employer shall have a right to rely on alleged verbal communications, including verbal communications with the Business Manager, in support of a contention that relief has been granted with respect to a job site project.   The parties specifically agree that verbal communications by and between any party to this labor contract or its representatives shall not be admissible in any legal or contractual proceeding, regardless of its form, in support of a contention that relief was granted concerning a specific project or job site.   Unless a written communication from the Union Business Manager is received by an Employer, an irrebuttable presumption shall exist that relief has not been granted with respect to the project or job site.

**Section 11.**   The Business Manager shall have sole, complete and absolute discretion in determining whether or not to grant relief on any specific job site or project.   It is agreed by the parties that neither the Association nor any Employer, or any other person, shall possess a right to force the Union to grant relief on any job or project.   It is further agreed that the Union, its officers, employees and members shall not be subject to any claims of any kind whatsoever or any liability to any signatory Employer or other person, whether such claim or assertion of liability be contractual or otherwise, based upon decisions or judgments made by the Business Manager with respect to specific job sites, the granting or denial of relief, the implementation of provisions set forth in this Article, or any other decision, determination, action or inaction by the Business Manager or any Union representative concerning these relief procedures.

30

**Section 12.** If an Employer attempts to work on a job site or project using these relief procedures without having requested relief in accordance with this Article and/or without having received a written grant of relief from the Union Business Manager, such Employer shall be construed, inter alia, to have violated the provisions set forth in Article II, Section 5 and shall be subject to the liquidated damage and other penalties set forth in Article XXXVII, Section 2.

**Section 13.** Article IX, Section 5 shall not apply to projects on which relief has been granted.

## ARTICLE XXXIX
### Duration of Agreement

**Section 1.** This Agreement shall become effective as of May 1, 2014 as between the RCA, its members and the Union. The Agreement shall become effective as to co-parties upon the execution of an assent by the co-party and furnishing of appropriate escrow deposits or Bonds required by this Agreement; and the Agreement shall continue in force and effect until midnight, April 30, 2016 and thereafter from year to year, unless and until terminated as provided in Section 2 of this Article.

**Section 2.** This Agreement may be terminated by either party upon written notice duly given to the other party on or before March 1 of the particular calendar year when it expires. Failure to give such notice shall result in automatic renewal from year to year until such notice has been given.

**Section 3.** Following notice of termination as provided in Section 2 of this Article, the parties hereto shall make a reasonable effort to conclude a new Agreement prior to the date of expiration of this Agreement.

The undersigned Employers and Union hereby agree to be bound by all terms, conditions and provisions of the attached Agreement.


By: _____

Executive Director, Roofing Contractors Association

ROOFING CONTRACTORS ASSOCIATION



By: _____

International Trustee

UNITED UNION OF ROOFERS, WATERPROOFERS
AND ALLIED WORKERS, LOCAL UNION NO. 30

# ASSENT

The undersigned Employer and the Union hereby agree to be bound by all terms, conditions and provisions of the attached Agreement. The Employer further agrees to be bound by all modifications; alterations and the results of further negotiations entered into between the Association and the Union, and further agrees that the Trustees designated by the Association for the jointly administered Funds shall be considered as acting on behalf of said Employer.

Firm Name:

_____

Address:

_____

City & State:

_____

Telephone: _____

Signature& Title: _____

Federal Tax I.D. No._____

Worker's Compensation Carrier: _____

Policy No.:_____

Surety Bond Carrier: _____

Bond No.:_____

LOCAL UNION NO. 30:

Business Representative: _____

Dated this _____ day of _____, _____.

# AGREEMENT AND ASSENT

The parties, United Union of Roofers, Waterproofers and Allied Workers Local 30 (hereinafter

"Union" or "Local 30") and _Union Roofing Contractors, Inc._____ (hereinafter, "Employer")

hereby agree to enter into this Agreement and Assent, for the purpose of establishing and maintaining a

collective bargaining relationship and agreement by and between the Union and the Employer.  In

furtherance of this Agreement and Assent, the parties agree:

1. The Employer hereby adopts, approves and agrees to be bound by all provisions set forth in the

   Collective bargaining agreement by and between Local 30 and the Roofing Contractors'

   Association covering Commercial Roofing and Re-roofing, effective May 1, 2001 through

   April 30, 2011 and the amendments to such collective bargaining agreement that were

   made and entered into effective May 1, 2011 (through April 30, 2012) and May 1, 2012
   (through

   April 30, 2014). The terms and provisions of such agreements, including the amendments

   thereto, are hereby incorporated by reference. The Employer acknowledges that it has received

   a copy of such agreements.

2. This Agreement and Assent is intended by the parties to establish a full collective bargaining

   Agreement by and between them and the Employer shall comply with all terms and provisions

   set forth in the agreements and amendments that are described and incorporated herein in

   paragraph 1.

3. This Agreement shall be effective as of May 1, 2011.

4. The Employer further agrees to be bound by all modifications, alterations and the results

   of further negotiations entered into between the Roofing Contractors' Association

   and the Union and further agrees that the Trustees designated by the

Association for the jointly administered employee benefit funds shall be considered

as acting on behalf of said Employer.

INTENDING TO BE LEGALLY BOUND, THE PARTIES HAVE ENTERED INTO THIS
AGREEMENT, EFFECTIVE AS OF THE DATE SET FORTH ABOVE.

_Union Roofing Contractors, Inc._

(Print Name of Company)

UNITED UNION OF ROOFERS
WATERPROOFERS AND ALLIED
WORKERS LOCAL 30

By: _Frank Lubiskij_
_President_
(Title)
Date: _5 / 1 /12_

By: _[signature]_
Date: _5 / 1 /2012_

**Employer Information**

Company Name: _Union Roofing Contractors, Inc._

Address: _13860 Townsend Road_

City & State: _Philadelphia, PA 19154_

Telephone: _(215) 464-6475_

Fax Number: _(215) 634-9863_

Email Address: _Kristin@unionroofing.net_

Federal Tax ID Number: ■■■■■■ _3583_

Workers Compensation Carrier: _Lion Insurance Co._

Workers Compensation Policy Number: _11075_

Surety Bond Carrier: _United States Surety Company_

Surety Bond Number: _#11686-7-1_

# ROOFERS LOCAL 30
## COLLECTIVE BARGAINING AGREEMENT COVERING
## COMMERCIAL ROOFING AND COMMERCIAL REROOFING
## MAY 1, 2014 THROUGH APRIL 30, 2016

### ASSENT

The undersigned Employer and the Union hereby agree to be bound by all terms, conditions, and provisions of the attached Agreement. The Employer further agrees to be bound by all modifications, alterations and the results of further negotiations entered into between the Association and the Union, and further agrees that the Trustees designated by the Association for the jointly administered Funds shall be considered as acting on behalf of said Employer.

Firm Name: Union Roofing Contractors, Inc.

Address: 12260 Townsend Rd

City & State: Phila, Pa 19154

Telephone: 215410410425

Email address: _____

Federal Tax I.D. No. ████ 3583

Worker's Compensation Carrier: Lion Insurance

Policy No.: PA71949-18007

Surety Bond Carrier: United States Surety Company

Bond No.: US11686

Signature: _____

Print Name & Title: Frank, Lubisky, CEO

### LOCAL UNION NO. 30

Business Representative: _____

Dated this _____ day of _____, 20_____

**RESIDENTIAL ROOFING, RESIDENTIAL REROOFING
AND SHINGLE, SLATE AND TILE WORK**

**ASSENT**

**5/1/15 – 4/30/17**

The undersigned Employer and the Union hereby agree to be bound by all terms, conditions, and provisions of the foregoing Collective Bargaining Agreement, as well as any negotiated alterations modifications, extensions, amendments, or supplements. In addition, the undersigned Employer hereby affirms that the Employer Trustees appointed on the jointly administered Trust Funds shall be deemed the Trustees of the below signed Employer and all terms, conditions, provisions, determinations, and the actions of the Trust Fund documents, resolutions, and decisions shall be binding on the parties.

**EMPLOYER**

Firm Name: UNION ROOFING CONTRACTORS, INC.

Address: 12760 Townsend Road

City, State, Zip Code: Phila, PA 19154

Telephone: (215) 464-6425

Email address: UNIONROOFING-INC@GMAIL.COM

Federal Tax I.D. No.: ▮▮▮ 3583

Worker's Compensation Carrier: LION

Policy No.: GWG 0334000059-110

Surety Bond Carrier: Aegis Security
?

Bond No.:

Signature:

Print Name: Frank Lubisky

Print Title: President

Signature:

**LOCAL UNION NO. 30**

Business Representative:

Dated this _____ day of _____, 20_____